UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

COURTNEY STRAIT,

        Plaintiff,

        -v-               1:24-CV-747 (DNH/PJE)

THOMAS NICOLLA
CONSULTING SERVICES,
PLLC, and THOMAS NICOLLA,
Individually,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:             OF COUNSEL:

GLEASON, DUNN, WALSH      LISA F. JOSLIN, ESQ.
  & O'SHEA             KATHRYN D BOBEL, ESQ.
Attorneys for Plaintiff
300 Great Oaks Boulevard,
  Suite 321
Albany, NY 12203

THE MILLS LAW FIRM       CHRISTOPHER K. MILLS, ESQ.
Attorneys for Defendants
1520 Crescent Road, Suite 100
Clifton Park, NY 12065

HURWITZ FINE P.C.        MICHELLE M.C. KULAK, ESQ.
Attorneys for Defendants
424 Main Street, Suite 1300
Buffalo, NY 14202

DAVID N. HURD
United States District Judge

## **DECISION and ORDER**

### I. **INTRODUCTION**

On June 5, 2024, plaintiff Courtney Strait ("Strait" or "plaintiff") filed this four-count civil action against her former employer Thomas Nicolla Consulting Services, PLLC ("TNCS") and its owner and/or majority stakeholder, Thomas Nicolla ("Nicolla"), in his individual capacity (collectively, the "defendants"). Dkt. No. 1. Plaintiff contends the defendants violated her rights under the Family Medical Leave Act of 1993, 29 U.S.C. §§2601, *et seq.* (the "FMLA") and discriminated against her on the basis of disability in violation of New York State Human Rights Law (the "NYSHRL") and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701, *et seq.* (the "Rehabilitation Act"). On June 25, 2024, defendants filed an answer, and the parties proceeded to complete discovery. Dkt. Nos. 7, 12, 14, 17.

On September 30, 2025, defendants moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Dkt. No. 18. Plaintiff has opposed, contending that there remain genuine issues of material fact in this matter which preclude granting summary judgment. Dkt. No. 19. The motion has been fully briefed and will be considered on the basis of the parties' submissions and without oral argument. Dkt. Nos. 18, 19.

## II.  BACKGROUND

The following section was developed from a review and comparison of the parties' Local Rule 56.1 statements along with the underlying record. *Compare* Defs.' Facts, Dkt. No. 18-55, *with* Pl.'s Facts, Dkt. No. 19-13; *see generally* Dkt. Nos. 18, 19.  Where the fact disputes identified by plaintiff pertain to either the characterization of defendants' statements or to the findings recorded in the materials cited, the following fact section is instead supported by direct citations to the relevant portion(s) of the record.  In other cases, the record is cited directly for the purpose of more fully describing the relevant facts or issues in dispute.

### A.  Plaintiff's History Prior to Her Employment at TNCS

From 1997 to 2001, plaintiff was a professional skier and a member of the United States Women's Alpine Ski Team.  Pl.'s Facts, Dkt. No. 19-13 at ¶ 236.  During that time, she contends she suffered multiple "significant physical injuries" that required "numerous medical treatments, including extensive surgeries and other procedures, between 2001 and 2012."  *Id.* ¶¶ 237–38.

In 2014, Strait obtained a doctorate degree in physical therapy and became a licensed physical therapist in New York.  Strait Dep., Defs.' Ex. B.

Dkt. No. 18-3 at 14:2–4; 14:15–23.[1]  From 2014 to 2017, plaintiff worked as a physical therapist at Albany Medical Center.  *Id*. at 21:8–9.  In 2018, Strait's first child was born and she became the child's "primary caregiver for a period of time[…]" *Id*. at 21:11–13.

Before she was hired by TNCS, Strait had a pre-existing medical history of, *inter alia*, depression, anxiety, chronic pain, arthritis, and had received numerous knee surgeries "on both knees from ski racing" and neck surgery.  Defs.' Ex. G, Dkt. No. 18-8; Defs.' Ex. H, Dkt. No. 18-9.  Plaintiff underwent three ACL reconstructions on her right knee between 2003 and 2010.  Pl.'s Ex. 3, Dkt. No. 19-3.

## B.  <u>Relevant Parties at TNCS</u>

At all relevant times, defendant Nicolla was the owner of TNCS.[2]  Defs.' Facts, Dkt. No. 18-55 ¶ 1; Nicolla Dep., Dkt. No. 18-7 at 18:4–19:5.  During this same time, non-defendant Christine Kostoroski ("Kostoroski") served as the Human Resources ("HR") Director at TNCS while non-defendant Rebecca Coffey ("Coffey") was the TNCS Practice Administrator.  Defs.' Facts. ¶¶ 2–3.  In this role, Coffey reported directly to Nicolla, and her responsibilities include "overseeing general business operations, financial, […] staff.  Just

---

[1] Pagination corresponds to CM/ECF headers.

[2] TNCS has been renamed Nicolla PT and OT Associates, LLC, but for purposes of this motion will nonetheless be referred to as TNCS at all times herein.  Defs.' Facts ¶ 1.

general oversight." Coffey Dep., Dkt. No. 18-5 at 18:4–8; 18:10–11. Kostoroski also reported to Nicolla and was responsible for oversight of TNCS personnel, payroll, health insurance, general staffing, vacation coverage, benefits administration, and the handling of workplace complaints. *Id.* at 48:14–49:14

### C. **Nicolla's Authority as Owner of TNCS**[3]

Nicolla testified that he was the sole owner of TNCS for roughly thirty years and, as of the date of his deposition, still maintained a 93 percent ownership stake in the company. Nicolla Dep., Dkt. No. 18-7 at 18:4–19:5. And according to Coffey's deposition testimony, "Nicolla was the sole owner during the time that Courtney was employed[.]" Defs.' Ex. D at 26. Nicolla also testified that he had "decision making authority for the practice[.]" Nicolla Dep. at 29:8–12.

Nicolla's decision-making authority covered the "financial aspects of the business, the [hiring] of staff, [and] contracts. *Id.* at 29:13–20. And his hiring authority included "physical therapists[,]" where he has the "final say" on hiring. *Id.* at 29:21–30:23. With respect to the firing of physical therapists, Nicolla testified that while he receives "recommendations from

---

[3] Because defendants seek the dismissal of each of plaintiff's claims against Nicolla individually and in light of the applicable legal standards for individual liability set forth *infra*, the Court has reviewed and cited to the relevant record to describe in more depth the nature of Nicolla's role at TNCS during plaintiff's employment.

[clinic] supervisors that people can be fired[,]" the decision to do so rests solely with him. *Id*. at 31:17–32:3.

Nicolla testified that, under certain circumstances, a clinic supervisor could "[make] the decision to terminate a physical therapist without [his] blessing." *Id*. at 32:15–18. Nicola added that this could occur "[i]f a therapist either slapped a patient [or] mistreated a patient" in which case they could be "fired on the spot." *Id*. at 32:19–33:2. In such a case, Nicolla stated a clinic supervisor would not need to first obtain his permission because "they know what my answer is. That [conduct] violates their [physical therapy] license and [its] termination." *Id*. at 33:3–6. But Nicolla could not recall such an incident over the previous five years. *Id*. at 33:7–12.

Nicolla has decision-making authority regarding promoting and demoting physical therapists. *Id*. at 33:20–34:7. And decisions regarding employee raises during the period of plaintiff's employment were his to make. *Id*. at 34:8–16. When asked who at TNCS reports directly to him, Nicolla replied, "[e]verybody." *Id*. at 34:23–35:7.

Finally, Nicolla testified that while "daily patient schedules" were set by "[t]he therapist's supervisors [and/or] receptionists at the clinics" and "the shift[s] of a physical therapist" are "set down by the supervisor, personnel, [or the TNCS coordinator of patient care]," they were still subject to his approval. *Id*. at 40:4–13. And Nicolla confirmed there have been situations where he

"objected to or disagreed with a proposed shift of schedule for a physical therapist." *Id.* at 40:14–17.  Nicolla elaborated that "[w]hen people do not give notice and decide to change their schedule or want to go on vacations when they are not approved, I get involved with that." *Id.* at 40:18–41:6.

## D.  Strait's Employment at TNCS

On March 10, 2020, Strait was hired by TNCS as a physical therapist. Defs.' Facts. ¶ 4.  Prior to joining TNCS, plaintiff was unemployed for approximately two years.  *Id.* ¶ 6; Strait Dep., Dkt. No. 18-3 at 21:18–23:3. Upon being hired, plaintiff was immediately furloughed due to the COVID-19 pandemic and did not start working for TNCS until August 2020.  *Id.* ¶ 5.  On June 10, 2020,[4] plaintiff acknowledged receipt of TNCS' Employee Handbook (the "Handbook").  *Id.* ¶ 7; Defs.' Ex. J, Dkt. No. 18-11; Defs.' Ex. K, Dkt. No. 18-12.

The Handbook sets forth that: (1) TNCS "provides Disability insurance for all of its employees"; and (2) employees who "have been continuously employed for at least one year" are "eligible to apply for an unpaid leave of absence for up to 12 weeks as provided under the [FMLA]."  Dkt. No. 18-12 at 11.  On August 4, 2020, plaintiff signed an employment agreement setting

---

[4] As plaintiff correctly points out in her responsive statement of material facts, defendant mistakenly described this event as having occurred on June 10, 2022.  A review of the record shows that it took place shortly after plaintiff was hired by TNCS in 2020.  Pl.'s Facts, Dkt. No. 19-13 ¶ 7.

forth that plaintiff would work 37.5 hours per week (pending caseload) and that she was an at-will employee.  Defs.' Facts ¶¶ 9–11.

### E.  Plaintiff's Medical Issues at TNCS

At some point in the Fall of 2021, Strait met with Nicolla, Coffey, and Kostoroski to discuss a pay raise she contends was withheld from her, along with her desire for a more consistent schedule.[5]  Defs.' Facts ¶ 12; Strait Dep., Dkt. No. 18-3 at 37:8–38:11. While plaintiff contends it was TNCS reducing her hours, Kostoroski and Nicolla each testified that Strait needed a reduced schedule to accommodate issues she was experiencing.  Kostoroski Dep., Dkt. No. 18-6 at 63:6–21; Nicolla Dep., Dkt. No. 18-7 at 67:1–13.  On September 30, 2021, Strait and Nicolla both signed a letter establishing that effective October 11, 2021, Strait would start a new work schedule consisting of 29.5 hours each week.  Defs.' Facts ¶ 14.  The letter contains a handwritten notation that plaintiff would receive a raise in the next pay period.  Defs.' Ex. M, Dkt. No. 18-14.

On March 9, 2022, plaintiff visited her doctor for an annual physical examination.  Defs.' Facts ¶ 16; Defs.' Ex. N, Dkt. No. 18-15.  Plaintiff told the doctor she "ha[d] a lot of stress in her life" and was "[b]urnt out from life

---

[5]  Plaintiff contends that while she was contracted to work 37.5 hours per week, there were weeks where TNCS "would reduce me down to about anywhere from 20 to 35 hours.  So after boiling down a year's worth of hourly work that I was doing, my estimate was about 29 to 30 hours of work so that's what I proposed to them during that meeting in which starting the next week my schedule was changed to 29.5 hours." Strait Dep., Dkt. No. 18-3 at 28:3–9.

and [two] kids." *Id*. ¶ 17; Defs.' Ex. N, Dkt. No. 18-15.  On July 21, 2022, plaintiff e-mailed Kostoroski requesting a meeting with her and Nicolla to discuss her health and her future at TNCS.  *Id*. ¶ 19; Defs.' Ex. O, Dkt. No. 18-16.  This meeting took place on August 2, 2022, when Strait requested a leave of absence from the practice "as soon as possible."  *Id*. ¶¶ 20–21; Strait Dep., Dkt. No. 18-3 at 80:17–22.  The substance of what was discussed during this meeting is uncertain, particularly as to the depth and nature of plaintiff's physical injuries and pain, but there is no dispute the meeting concluded with an agreement that Strait would take off the month of November 2022.  *Id*. ¶ 25;  Strait Dep. at 81:4–6, 81:15.

At the time of this August 2, 2022 meeting, the record does not indicate that a doctor had told Strait that she should not be working as a physical therapist on the basis of any medical condition.  Defs.' Facts ¶ 26; Strait Dep., Dkt. No. 18-3 at 78:9–13.  Further, Strait testified that she "never" experienced difficulties performing her job functions but that she "carried around a lot more pain[.]"  *Id*. ¶ 27; Strait Dep., Dkt. No. 18-3 at 79:2–6.  But Strait contends that Nicolla and Coffey were made aware during this meeting that plaintiff suffered from carpal tunnel syndrome and would require surgery due to her extensive knee pain.  Pl's Facts ¶ 262; Nicolla Dep., Dkt. No. 18-7 at 123:2–13.  During this meeting, Nicolla requested that Strait submit a formal letter confirming her request for leave, providing a basis for

the leave request and promising to return to work afterwards.  Defs.' Facts ¶ 29; Strait Dep. 82:17–83:19.

On August 4, 2022, Kostoroski e-mailed Strait to confirm she would be taking November 2022 off under the FMLA in order to provide plaintiff with the "necessary paperwork."  Defs.' Facts ¶ 30.  Defendants contend it is undisputed that they were the first ones to raise the idea of Strait taking FMLA leave.  *Id*. The next day, Kostoroski e-mailed Strait again requesting a letter confirming plaintiff's need for time off.  *Id*. ¶ 32.  On August 17, 2022, Strait sent TNCS a letter formally requesting leave.  *Id*. ¶¶ 33.  While the letter stated that the leave was for "personal reasons[,]" it did reference any specific physical or medical condition.  *Id*. ¶ 34; Defs.' Ex. Q, Dkt. No. 18-18. And when Strait e-mailed this letter to Kostoroski, it was accompanied by a message characterizing the leave as "personal and medical."  Pl.'s Ex. 7, Dkt. No. 19-7 at 2.

The following day, Kostoroski provided Strait with FMLA leave request paperwork.  *Id*. ¶ 36; Defs.' Ex. Q, Dkt. No. 18-8.  Kostoroski advised plaintiff that the paperwork included a "certification of healthcare provider" that must be completed as part of the application and returned back to her by September 5, 2022.  *Id*. ¶ 38; Defs.' Ex. S, Dkt. No. 18-20.  Strait responded the same day, telling Kostoroski that because she had "too much on [her] plate[,]" she could not complete the paperwork by then and that they would

- 10 -

be signed in October of 2022 "as the time off is not [until] November." *Id*. ¶ 39; Dkt. No. 18-20.

On September 6, 2022, Coffey e-mailed Strait stating:

> "I wanted to follow up with you about our conversation related to your leave of absence request for November. [Kostoroski] mentioned she gave you paperwork but you stated you would not be able to complete it until October. We really need more backup from a doctor stating you need to take a Medical leave. When we spoke last month, you assured us that if you took this month off, that you would be ready to go upon return. We have no information on your part. Please let me know when you expect to get the info to us[.]"

Defs.' Facts ¶¶ 40–41; Defs.' Ex. T, Dkt. No. 18-22. On September 29, 2022, Strait received a pay rate increase to $39.00 per hour. *Id*. ¶ 42; Defs.' Ex. U, Dkt. No. 18-22.

On October 10, 2022, about two months after the Aug 2, 2022 meeting, Strait saw her primary care physician, Dr. Steffani Cotugno ("Dr. Cotugno") for an "acute patient visit." *Id*. ¶ 43; Defs.' Ex. V, Dkt. No. 18-23. The medical record from this visit indicates that plaintiff's active problems include: "[a]rthralgia of multiple joints[,]" "[a]rthritis[,]" "[c]hronic back pain[,]" "[c]hronic neck pain[,]" "[g]eneralized anxiety disorder[,]" "[k]nee pain, bilateral[,]" "[m]ajor depression" and "[r]eaction to chronic stress" along with a history of alcohol use and abuse. Dkt. No. 18-23. During this visit, Dr. Cotugno observed that TNCS was "aware of her situation, and offering

total support to help her get assistance. She is here to seek that." Defs.' Facts ¶ 47; Dkt. No. 18-23 at 1.

During this visit, Strait presented Dr. Cotugno with FMLA paperwork to complete on her behalf. *Id*. ¶ 48; Dkt. No. 18-23. In the "medical history of present illness" section of plaintiff's visit notes, Dr. Cotugno indicated that, while she agreed with Strait taking a leave of absence, plaintiff was uncertain that waiting until November 1st was "the proper way to go about getting out of work" and is "maybe looking to be removed from work effective November 1st, at least for [a] month." Dkt. No. 18-23 at 1. In the "medical assessment" section of plaintiff's visit notes, Dr. Cotugno wrote:

> "Regarding [Strait's] time off from work, [I] would fully support this. I do feel she needs to take a leave of absence. [Strait] tells me she cannot do this until November 1st due to her volume at work. I am not sure this is the proper decisions. She brought FMLA papers. I did not complete. I feel she needs to go out on a disability, and when she returns, then use her FMLA. She will discuss this further with her employer, and get back to me to determine the appropriate step from their perspective."

Dkt. No. 18-23 at 2. TNCS offered its employees short-term disability insurance but Strait was not enrolled in that policy. *Id*. ¶ 51.

The following day, Strait emailed Kostoroski stating her doctor was "ready to take [her] out of work immediately" and that she "had no clue" regarding what papers her doctor needed to sign or how extensive the

supporting documentation for her request needed to be.[6]  Defs.' Ex. X, Dkt. No. 18-25.  Plaintiff also noted that she knew these papers needed to be submitted by October 15, 2022.  *Id*.  In response, Kostoroski forwarded plaintiff an email containing FMLA paperwork that she had previously sent Strait in August, indicating she was also "adding the disability form" in case plaintiff qualified.[7]  *Id*.  Responding to the subject line of plaintiff's email, Kostoroski also told plaintiff that she would "be requesting FMLA, not [Paid Family Leave)]" citing the three reasons an employee can be eligible for Paid Family Leave ("PFL").  *Id*.  Strait acknowledged receipt of these forms and told Kostoroski she would get them to her doctor.  Defs.' Facts ¶ 59; Dkt. No. 18-25.

On October 18, 2022, Strait e-mailed Kostoroski asking if there was any paperwork for her "to apply for financial assistance."  *Id*. ¶ 60; Defs.' Ex. Y.  The following day, Kostoroski provided plaintiff with a disability claim form to complete.  Defs.' Ex. Z, Dkt. No. 18-27.  Thereafter, Dr. Cotugno completed and signed off on the FMLA paperwork in support of Strait's leave request.  *Id*. ¶ 62; Defs.' Ex. R, Dkt. No. 18-19.  This paperwork, entitled Notice of Eligibility & Rights and Responsibilities[8] under the FMLA, included

---

[6] The email from plaintiff to Kostoroski was captioned "pfl or fmla[.]"  Dkt. No. 18-25.

[7] As it appears in the record, there do not appear to be any files attached to this email.  Dkt. No. 18-27.

a section (Part A: Medical Information) estimating that plaintiff's condition would last for one month and specifying she would be incapacitated and receiving treatment from November 1, 2022 to December 1, 2022. Dkt. No. 18-19 at 5. It also states that plaintiff was seen for medical treatment on October 7, 2022 and that a follow-up visit was scheduled for November 7, 2022. There was also a section in Part A to provide a brief description of other "appropriate medical facts" related to the condition warranting a leave request that was left blank. Defs.' Facts ¶ 63; Dkt. No 18-19 at 6.

In the following section (Part B: Amount of Leave Needed), Dr. Cotugno indicated plaintiff would receive medical treatment(s) and described those treatments as "physical therapy/outpatient office visits" without specifying the dates of any treatments. *Id*. at 6. The duration of the treatment was listed as "one month" and that Strait would be "incapacitated" from November 1, 2022 until December 1, 2022. *Id*. In the next section (Part C: Essential Job Functions), the form allows for a description of the medical facts related to the condition for which FMLA leave is sought, but this was left blank. *Id*. ¶ 63 Defs.' Facts ¶ 64; Dkt. No. 18-19 at 6. Finally, the FMLA paperwork advised Strait she was required to provide TNCS with periodic

---

[8] This document is also referred to as a Form WH-380-E. *See* Dkt No. 18-19 at 4–7.

- 14 -

reports of her status and affirm her intent to return to work every two weeks.[9]  *Id.* ¶ 65; Dkt. No. 18-19.

Despite little explanation as to why Strait was unable to perform any of her essential job functions, she was nonetheless granted FMLA leave starting November 1, 2022.  *Id.* ¶ 66; Dkt. No. 18-19.  The paperwork stated: "You have stated that you intend to return to work on December 1, 2022."  Dkt. No. 18-19 at 11.

### F.  Plaintiff's FMLA Leave

While on leave, Strait spent time in Maine and attended a college reunion in Martha's Vineyard.  *Id.* ¶ 68; Strait Dep., Dkt. No. 18-3 at 216:13–21.  On November 7, 2022, plaintiff had a follow-up visit with Dr. Cotugno.  *Id.* ¶ 69;  Defs.' Ex. AA, Dkt. No. 18-28.  Dr. Cotugno's notes indicate that Strait "has not changed anything with her behavior regarding alcohol intake" and noted "[a]lcohol abuse."  *Id.* ¶ 70; Dkt. No. 18-28.  Dr. Cotugno indicated her concern about plaintiff's alcohol intake and urged her to "attend 'meetings[.]'"  *Id.* ¶ 71; Dkt. No, 18-28.

The record from this visit also reflects that plaintiff "ha[d] continued concerns about being able to financially afford" potential surgeries or being out of work for an extended time, and that "she has no idea what sort of

---

[9]  The FMLA paperwork defendants reply upon includes two forms: Form WH-380 and Form WH-381.  The referenced Part F, unlike all prior referenced sections, is contained in Form WH-381. *See* Dkt. No. 18-19 at 8–11.

resources such as disability that her employer has[.]" Defs.' Facts ¶ 72; Dkt. No. 18-28. While this appointment occurred one week into plaintiff's FMLA leave, Dr. Cotugno noted that Strait "ha[d] not done anything in the past month to really get herself in a positive direction" and advised that she seek counseling. *Id.* ¶ 73; Dkt. No. 18-28. Dr. Cotugno also observed that plaintiff "needs to work more with her employer" in order "to determine what she needs to do regarding her disability." *Id.* ¶ 74; Dkt. No. 18-28. Dr. Cotugno noted that she offered Strait "extensive resources" but that "as she explained to [plaintiff], 'it is all in her hands[.]'" *Id.* ¶ 75; Dkt. No. 18-28.

Nothing in the record shows that plaintiff and TNCS communicated during this leave period until November 21, 2022, when Coffey emailed plaintiff a proposed schedule upon her return to work. Defs.' Facts ¶¶ 76–77. This schedule resembled Strait's schedule prior to her leave as to total hours, pay benefits, and responsibilities. *Id.* ¶¶ 14, 78–84. Coffey stated in her November 21, 2022 email that this proposed schedule "could start the week of [December 5th] if possible[.]" Dkt. No. 18-29. Strait responded the same day, informing Coffey that she was trying to schedule a carpal tunnel release with orthopedic surgeon Dr. George Zanaros ("Dr. Zanaros"). *Id.* ¶ 85; Dkt. No. 18-29. Defendants contend this was the first time she mentioned such a procedure. *Id.* Due to this procedure, plaintiff said a December 1, 2022 return to TNCS might be "difficult" but that she did not anticipate it being

- 16 -

much longer before she returned to work.  *Id*. ¶ 86; Dkt. No. 18-29.  Strait also indicated uncertainty about the proposed schedule and that she would discuss it with her family.  *Id*. ¶ 88; Dkt. No. 18-29.  But plaintiff gave no indication she would be unable to perform the essential functions of her job upon returning.  *Id* ¶ 89.

Coffey replied to Strait that "[t]here was a lot of 'good faith' in giving you [November 2022] off, I would REALLY hope you are ready to be back in action 12/1 (or 12/5) as you promised. Please let me know if this is an issue." Defs.' Facts ¶ 91; Dkt. No. 18-29 at 1.  Strait responded, "I will be back for the first week of December as promised."  *Id*. ¶ 92; Dkt. No. 18-29 at 1. Coffey instructed Strait to let TNCS staff know which day between December 1st and December 5th she wanted to return and whether she wanted the proposed schedule revised if eleven-hour workdays were too long.  *Id*.  On November 28, 2022, TNCS Patient Care Coordinator Meghan Appleby emailed Kostoroski and Coffey about work schedules, stating:

> I opened Courtney up for the schedule that [Coffey] and [Nicolla] had talked to her about. (Mon & Wed 7:30-7, Friday 7:30-4:30) This week is just the Friday schedule.  (I already clarified with [plaintiff] that she is good to work that schedule, it sounds like the only issue will be when she has her hand surgery)[.][10]

---

[10]  There is no dispute between the parties that "being 'opened up for the schedule' means patients were already scheduled for Strait to see during those hours."  Defs.' Facts ¶ 94.

Defs. Facts ¶ 93; Defs.' Ex. DD, Dkt. No. 18-31 at 1.  And Strait knew she had a "full schedule" of patients starting December 1, 2022.  Defs.' Facts ¶ 95.

Strait's medical records show that as of November 21, 2022, she had not seen Dr. Zanaros since 2020.  *Id*. ¶ 87; Defs.' Ex. CC, Dkt. No. 18-30.  But on November 29, 2022, after her e-mail exchange with Coffey, she saw Sean Leahy ("Leahy"), a physician's assistant at the Bone & Joint Center regarding "[r]ight hand numbness" and a "right wrist cyst[.]"  *Id*. ¶ 96; Dkt. No. 18-30.  Leahy and Strait discussed "both surgical and non-surgical" options for her carpal tunnel syndrome.  *Id*. ¶ 97; Dkt. No. 18-30.

### G. Plaintiff's Inability to Return from FMLA Leave

On November 30, 2022, the day before plaintiff was set to return, she emailed Coffey and Kostoroski to provide "an update on the doctor appointments [she had] over the past four weeks."  *Id*. ¶ 100; Defs.' Ex. EE, Dkt. No. 18-30.  Strait added that "[a]s much as [she] would love to get back to work, as intended, without needing upcoming surgeries, my body is just not allowing for it and my doctors are advising against it." Defs.' Facts. ¶ 101; Defs. Ex. EE, Dkt. No. 18-32 at 1.  Strait indicated she would be undergoing a carpal release and cyst removal surgery performed by Dr. Zanaros on December 14, 2022 and that he estimated the procedure would require a four-week recovery period before return to work.  *Id*. ¶ 102; Dkt. No. 18-32.  While the risks of a carpal tunnel surgery had been discussed with Leahy, the only

medical provider Strait saw regarding her wrist in November, the notes from that visit give no indication that a surgery was scheduled for December 14th. *Id.* ¶¶ 103-104; Dkt. No. 18-30.

Strait also told TNCS she would be getting a total knee replacement in March of 2023. *Id.* ¶ 105; Dkt. No. 18-30. Her medical record does not indicate she saw her knee surgeon, Dr. Frederic Buechel ("Dr. Buechel") during her November FMLA leave. *Id.* ¶¶ 106, 108. But she did see Dr. Buechel on October 28, 2022 where a total knee replacement surgery was recommended. Pl.'s Facts ¶ 281, Dkt. No. 19-13; Pl.'s Ex. 3, Dkt. No. 19-3. But as of November 30, 2022, no knee surgery was scheduled. *Id.* ¶ 107; Strait Dep., Dkt. No. 18-3 at 173:22–174:16.

Strait did not provide the defendants with medical documentation to suggest she would be unable to return to TNCS on December 1, 2022 or that she had any disability or medical condition that would prevent her ability to perform any one of her essential job responsibilities. Defs.' Facts. ¶ 113. Strait testified that as of November 30, 2022 "I was able and willing to come back to work as a physical therapist on December 1st" and that, despite what she stated in her November 30, 2022 email, she intended to be at work the next day. *Id.* ¶ 114; Strait Dep., Dkt. No. 18-3 at 174:21–175:2; 176:4–11. Plaintiff contends she sent the email because "[s]he simply wished to give

defendants notice of her upcoming surgeries.  Pl.'s Facts, Dkt. No. 19-13 ¶ 292.

### H.  November 30, 2022 Phone Call and Alleged Termination

Upon receipt of Strait's email and given that Strait was due to see patients the following day, Coffey requested a phone call with plaintiff.  Defs.' Facts ¶ 110.  An approximately forty-minute phone call, of which no audio recording exists,[11] ensued between plaintiff, Coffey, and Kostoroski that same day.  *Id*. ¶¶ 116–18.  Plaintiff contends she was "fired" during this phone call.  *Id*. ¶ 119; Strait Dep., Dkt. No. 18-4 at 84:2–4.  Strait testified that the words "fired" and "terminated" were not used during the call, but that Kostoroski used words to the effect of: "If you don't resign, we are going to have to let you go." Pl.'s Facts ¶ 302.

According to Strait, Kostoroski also stated that "if you can't work and aren't going to be able to do your job we have to let you go." Pl.s' Ex. 5, Dkt, No. 19-5.  Strait contends Kostoroski added: "You'll need to submit a letter of resignation as soon as possible."  *Id*. ¶ 120; Strait Dep., Dkt. No. 18-3 at 182:12–19.  Strait never received anything telling her she was fired or terminated.  *Id*. ¶ 121; Strait Dep., Dkt. No. 18-4 at 144.  While FMLA leave may have come up during this call, Strait never requested additional FMLA

---

[11]  Plaintiff has both introduced handwritten notes she contends taking during the phone call and testified as to their contents.  *See* Pl.'s Ex. 5, Dkt. No. 19-5.

leave for December 1, 2022 and instead indicated three times on the call that she was going to come back to work. *Id*. ¶ 122;  Strait Dep., Dkt. No. 18-3 at 186:24–187:3.

According to Coffey, this phone call was "confusing" and that Strait "seemed very lost, very confused with what was happening in her life[.]" Defs.' Facts ¶ 123; Coffey Dep., Dkt. No. 18-5 at 112:12–113:9.  Kostoroski also testified that plaintiff was "all over the place" and "erratic" during the call and was not "making sense[.]" *Id*. ¶¶ 124–25; Dkt. No. 18-6 at 148:19–20, 158:3–17.  Coffey and Kostoroski testified suggesting to Strait during the call that she could "get her mental health in order [and] take care of her surgeries" and "could come back to work when ready." *Id*. ¶ 126; Coffey Dep., 159:21; Kostoroski Dep., 155:14–156:2; 158:3–17.  But there is no clear explanation as to why, unlike in August of 2022, FMLA leave went unmentioned.

There is no dispute that Nicolla was not present during the call, and Nicolla testified he was not informed about the call either before or after it occurred. *Id*. ¶¶ 128–29; Strait Dep., 196:13–21; Nicolla Dep., Dkt. No. 18-7 at 130:1–22.  At no time did TNCS ever send Strait a termination letter or any other notice of firing. *Id*. ¶ 134; Kostoroski Dep., Dkt. No. 18-6 at 166. And defendants contend that Strait remained an employee in their accounting system. *Id*. ¶ 135; Kostoroski Dep. at 166:6–8.

## I. Aftermath of the Alleged Termination Call

On December 4, 2022, Strait e-mailed Coffey and Kostoroski to thank them for their "understanding and support during this difficult time." *Id*. ¶ 139; Defs.' Ex. FF.  Plaintiff wrote:

> "I completely understand where you guys are coming from; specifically, how you have to fill a full-time position in my absence to keep the clinic afloat.  Please know that I stand committed to [TNCS].  I trust that I will be able to be an asset on a per diem basis between surgeries."

*Id*. ¶ 140; Defs.' Ex. FF, Dkt. No. 18-33.  On December 13, 2022, Strait informed Coffey and Kostoroski she cancelled her wrist surgery because she had been "symptom free" and moved her knee surgery up to get it out of the way.  *Id*. ¶ 141; Defs.' Ex. GG, Dkt. No. 18-34.  This email was sent from plaintiff's TNCS e-mail address.  *Id*. ¶ 142; Dkt. No. 18-346.  Strait also mentioned hearing the TNCS clinic had been busy and offered to "work to help right now."  *Id*. ¶ 143; Dkt. No. 18-34.

On December 16, 2022, plaintiff received a payout check from TNCS for her outstanding leave balance.  Pl.'s Facts ¶ 315; Pl.'s Ex. 4.  Strait contends this was emblematic of being fired, while Kostoroski testified this was to "help her out financially" while she was unable to work.  *Id*.; *see also* Kostoroski Dep., Dkt. No. 18-6 at 169:10–171:18.  Plaintiff also applied for and received unemployment insurance benefits after November 30, 2022, which Kostoroski said was also done to help Strait financially although

plaintiff was not terminated.  Pl.'s Facts ¶ 316; Kostoroski Dep, Dkt. No. 18-6 at 163:16–166:5.  TNCS did not contest plaintiff's application for unemployment, and her unemployment records indicate her last day of work at TNCS was October 31, 2022.  Pl.'s Facts ¶¶ 317–18; Pl.'s Ex. 12, Dkt. No. 19-12.

On January 12, 2023,[12] a TNCS employee reached out to inquire whether Strait could work at their "Washington Avenue clinic to fill in for a physical therapist who was having surgery[.]  Defs.' Facts ¶ 144.  Strait replied "yes, definitely" and that would "accommodate whatever hours [she could.]  *Id.* ¶ 145.  That same day, Kostoroski e-mailed plaintiff her January 2023 work schedule for the period before she was set to go out for knee surgery.  *Id.* ¶ 146.

On January 13, 2023, Kostoroski asked plaintiff to sign and return a letter acknowledging her classification at TNCS as a "temporary employee" who would be returned to "active employee" status when "she is working."  *Id.* ¶¶ 148–49; Defs.' Ex. II, Dkt. No. 18-36; Defs.' Ex. JJ, Dkt. No. 18-37.  Plaintiff signed the form and returned it to TNCS on January 18, 2023.  *Id.* ¶¶ 153–156; Dkt. No. 18-36.  This letter advised plaintiff that she would

---

[12]  While defendants' facts specify this date as January 12, 2022, it will be more properly construed as the same date in 2023.

continue to be a "credentialed provider" and remain covered under TNCS' malpractice insurance. *Id.* ¶ 158; Defs.' Ex. JJ.

On January 17, 2023, plaintiff informed Kostoroski that her knee surgery was now scheduled for January 26, 2023. Defs.' Facts ¶ 161. Indeed, Strait underwent knee surgery on that date and was thereafter incapable of working for TNCS from January 26, 2023 until March 15, 2023—a total of 49 days. *Id.* ¶ 166; Strait Dep., Dkt. No. 18-3 at 219:1–9. Following her knee surgery, TNCS provided Strait with physical therapy to assist with her recovery and waived her co-payments. *Id.* ¶ 165; Dkt. No. 18-7 at 95–96; Strait Dep., Dkt. No. 18-3 at 215:23–216:12.

On February 22, 2023, Coffey emailed plaintiff about a role at TNCS that might be "perfect" for Strait as she continued to rehabilitate her knee. *Id.* ¶ 167; Defs.' Ex. LL. The position involved "working in the ambulatory center upstairs from" TNCS' Washington Avenue location "assisting patients who were coming off of joint replacement surgery." *Id.* ¶ 168; Defs.' Ex. D at 46–47. On February 24, 2023, plaintiff replied that "it might be too soon for me to be doing transfers" but that she liked the idea of returning for "lighter hours[.]" *Id.* ¶ 169; Defs.' Ex. MM. Plaintiff was unsure whether she was physically prepared to do this role or if it was safe for her knee during recovery. Pl.'s Facts ¶ 331.

On February 28, 2023, Coffey requested a meeting with Nicolla to discuss a potential start date for plaintiff with the intent of getting her back to "working full time in the clinic[.]" *Id.* ¶¶ 170–71; Defs.' Ex. MM; Defs.' Ex. D at 64. Thereafter, on March 2, 2023, Strait, Nicolla, and Coffey met "to discuss the ambulatory job assisting joint replacement patients at the Bone & Joint Center[.]" *Id.* ¶ 173; Defs.' Ex. MM; Defs.' Ex. NN; Defs. Ex. B at 223. Coffey testified that plaintiff was treated with "kid gloves." *Id.* ¶ 178; Defs.' Ex. D at 69. Coffey also says there was "a lot of pushback" from Strait about taking on more hours and no indication plaintiff was interested in working more hours. *Id.* ¶ 179; Defs.' Ex. D at 70. According to Strait, she could not return to work on a weekly basis until May 16, 2023, after which she anticipated being able to work two days a week, followed by a full week off, followed by another week of working two days. *Id.* ¶¶ 176, 180; Defs.' Ex. B at 226. After the March 2, 2023 meeting, Strait sent TNCS a work schedule she made that included six days of work for the period between March 23, 2023 and May 18, 2023. *Id.* ¶ 174; Defs. Ex. OO, Dkt. No. 18-42. Strait contends that throughout this time, she was managing numerous medical appointments and safety restrictions related to her knee while also caring for her children but nonetheless arranged to work the per diem hours assigned by defendants. Pl.'s Facts ¶ 335.

Nicolla testified that, while concerned given plaintiff's constant dictating as to when she could and could not work, TNCS nonetheless "went over and above" to aid plaintiff and accommodate her schedule. Defs.' Facts ¶¶ 182–83. And according to Coffey, plaintiff "had a lot going on in her life at the time, and [TNCS] was trying to give her grace and let her dictate her hours more tha[n] an employer normally would tolerate[.] *Id.* ¶ 184; Defs.' Ex. D at 72. Coffey testified that "there were plenty of times that Courtney was asked to do work that she was unable to do because of other things." Defs.' Ex. D at 181. Coffey found that Strait "was still not ready to commit to the job[.]" *Id.* ¶ 188; Coffey Dep., Dkt. No. 18-5 at 64:14–15. Coffey added this was a "kick in the teeth" because TNCS had "done everything in that year to support [Strait]" and "get her back to a position that worked[.]" but that Strait gave no indication she was going return to the clinic on a full-time basis. *Id.* ¶ 189; Coffey Dep. at 71:8–14.

Strait's medical records indicate she was cleared to return to work as of March 16, 2023. Defs.' Facts ¶ 190; Defs.' Ex. PP. But according to defendants, Strait never requested to work a full 29.5 workweek after returning from FMLA leave. *Id.* ¶ 192; Defs.' Ex. B at 218. Nicolla claims he received complaints from staff about covering Strait's absences. *Id.* ¶ 195. In Strait's view, she never asked to work a full work schedule because she was "fired" on November 30, 2022. Defs.' Ex. B at 218.

On May 10, 2023, Strait sought medical attention due to "severe numbness" in her right hand. *Id.* ¶ 196; Defs'. Ex. RR, Dkt. No. 18-45. During this visit, she reported having "recently returned back to work" following her knee replacement. *Id.* ¶ 197; Dkt. No. 18-45. On May 22, 2023, Kostoroski emailed Strait advising her that to update her physical therapy license which was soon-to-expire, to which Strait replied that she has "[b]een trying to find time" and would "hopefully" get it done in the next week. *Id.* ¶ 203; Defs.' Ex. TT. Strait added that she would not be around much over the summer of 2023 including the entirety of August, which she intended to spend in the Pacific Northwest with her family. *Id.* ¶¶ 204–05; Defs.' Ex. TT, Dkt. No. 18-47.

On June 23, 2023, Kostoroski emailed Strait so see if she intended to continue her working "at the Bone & Joint Center[.]" *Id.* ¶ 207; Defs.' Ex. UU, Dkt. No. 18-48. Kostoroski also proposed adding 10 to 15 work hours at defendants' Latham Clinic. *Id.* ¶ 208; Dkt. No. 18-48. Defendants assert they still intended to get plaintiff back to a full work schedule at the clinic. *Id.* ¶ 209. Defendants contend that plaintiff responded that while she would like to continue her hours at the Bone & Joint Center, "she could only 'swing an evening' at the Latham Clinic" because of personal obligations regarding her children. *Id.* ¶ 210; Dkt. No. 18-48.

On August 29, 2023, plaintiff emailed Kostoroski to see if "the Bone and Joint ambulator job was still going on" and whether TNCS had any need for physical therapy services. *Id.* ¶¶ 222–23; Defs.' Ex. XX, Dkt. No. 18-51. That same month, plaintiff applied for another physical therapy job at "the Green Room in Clifton Park[.]" *Id.* ¶ 224. When plaintiff received an offer to work there, she declined it. *Id.* ¶ 225. Plaintiff testified she did not take any jobs she was offered after TNCS because "the time and schedule didn't work with my wife's scheduling and the childcare, or the amount of time[.]" *Id.* ¶ 226.

On September 5, 2023, Strait underwent an annual physical. *Id.* ¶ 227; Defs.' Ex. YY. Her health since her previous physical was "described as poor[.]" *Id.* ¶ 228; Defs.' Ex. YY. That same day, plaintiff received an email from Kostoroski stating "at this time you are not needed but we will reach out to you if something changes." Pl.'s Facts ¶ 342; Defs. Ex. XX, Dkt. No. 18-51. But Strait contends she was never provided with thirty days of notice as to her termination which was required in her employment contract. Pl.'s Facts ¶ 343; Def. Ex. L, Dkt. No. 19-13 at 4.

Defendants contend Strait was terminated from her employment on November 1, 2023 while plaintiff asserts this took place nearly a year earlier on November 30, 2022. *Id.* ¶ 231; Defs.' Ex. ZZ, Dkt. No. 18-53. Between September 2023 and September 2024, plaintiff did not apply to a physical

therapy job. *Id.* ¶ 232–33.[13]  When plaintiff applied for a physical therapy job at "MV PT" in September 2024 and received an employment offer, she turned it down. *Id.* ¶ 233.  Plaintiff turned down "at least three physical therapy jobs" in between September and October of 2024. *Id.* ¶ 234.  Defendant contends that plaintiff was on leave from TNCS for more than twelve weeks during the twelve-month period from October 1, 2022 to October 1, 2023. *Id.* ¶ 235.

## III.  **LEGAL STANDARD**

Under Federal Rule of Civil Procedure ("Rule") 56, summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCutcheon v. Colgate-Palmolive Co.*, 62 F.4th 674, 686 (2d Cir. 2023) (quoting *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017)).

A fact is "material" where it "might affect the outcome of the suit under the governing law." *Hilton v. Wright*, 928 F. Supp. 2d 530, 544 (N.D.N.Y. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "In

---

[13] The Court notes, however, that defendant separately asserted plaintiff applied to a physical job in August 2023.  Defs. Facts ¶ 225.

reviewing the motion, the district court must 'draw all reasonable inferences against the party whose motion is under consideration.'" *Lake v. HealthAlliance Hosp. Broadway Campus*, 738 F. Supp. 3d 208, 215 (N.D.N.Y. 2024) (quoting *Williams v. MTA Bus Co.*, 44 F.4th 115, 125 (2d Cir. 2022)). But "[a] question of material fact does not exist merely because plaintiff disagrees with the deposition testimony and documentary evidence produced by defendant[s]." *Turner v. Delta Airlines, Inc.*, 658 F. Supp. 3d 123, 131 (E.D.N.Y. 2023) (citing *Anderson*, 477 U.S. at 247–48).

After a moving party carries its burden under Rule 56(c), its opponent then "must provide more than conclusory allegations … and show more than some metaphysical doubt as to the material facts." *See Vista Food Exch., Inc. v. Comercial De Alimentos Sanchez S De R L De C.V.*, 147 F.4th 73, 85 (2d Cir. 2025) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 20210)). Instead, "[t]he non-moving party 'must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact.'" *Murrell v. Moscicki*, 790 F. Supp. 3d 213, 220 (W.D.N.Y. 2025) (quoting *Brown v. Eli Lilly & Co.*, 654 F.4d 347, 358 (3d Cir. 2011)). "Indeed, 'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" *Campbell v.*

*Belgard*, 765 F. Supp. 3d 234, 241 (W.D.N.Y. 2025) (quoting *Anderson*, 477 U.S. at 247–48).

"In sum, the ultimate test 'is whether the evidence can reasonably support a verdict in plaintiff's favor.'" *Waltman v. United Servs., Inc.*, 635 F. Supp. 3d 86, 98–99 (D. Conn. 2022) (quoting *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Waltman*, 635 F. Supp. 3d at 99 (quoting *Baez v. JetBlue Airways Corp.*, 793 F.3d 269, 274 (2d Cir. 2015)).

## IV. <u>DISCUSSION</u>

Plaintiff brings claims for: (1) discrimination, retaliation, and interference in violation of the FMLA; (2) discrimination on the basis of disability or perception of disability in violation of the NYSHRL; and (3) disability based on disability in violation of the Rehabilitation Act. Dkt. No. 1. Defendants argue that plaintiff's claims should be dismissed because there is no evidentiary support as to her allegations of discrimination, interference, or retaliation because "[p]laintiff was afforded her full [complement] of rights under the [FMLA], the [NYSHRL] and the Rehabilitation Act." Defs.' Mem., Dkt. No. 18-54 at 4. In defendants' view, they "went above and beyond all legal requirements" to provide Strait "with accommodations and benefits

beyond those required by law." *Id*.  Finally, defendants contend that Nicolla cannot be individually liable for any of plaintiff's claims. *Id*.

Plaintiff has opposed.  Dkt. No. 19.  Turning first to plaintiff's FMLA claims, Strait argues she has made out a *prima facie* FMLA retaliation claim, that defendants have not set forth a non-retaliatory reason for plaintiff's firing, and that plaintiff has demonstrated pretext. *Id*. at 11–20.  Strait similarly contends that she has met her burden for her FMLA interference claim. *Id*. at 20–23.  Finally, she argues that defendant Nicolla is not entitled to summary dismissal of her FMLA claims against him because he is an employer as defined under the statute. *Id*. at 25.

Turning next to plaintiff's NYSHRL claims, she argues she again makes a *prima facie* case of discrimination and that defendants once more fail to offer a non-discriminatory reason for her termination. *Id*. at 28.  Strait asserts that, even if defendants could offer any non-discriminatory reason for terminating plaintiff, her termination was still pretextual. *Id*.  Plaintiff also contends that because Nicolla was the owner of TNCS with the authority to hire and fire employees at TNCS, he is individually liable as an employer as defined under the NYSHRL. *Id*. at 29.

Finally, plaintiff asserts there are triable issues of material fact with respect to her Rehabilitation Act claims because the record suggests her physical impairments and resulting need for medical leave form the sole

basis for her discharge from TNCS. *Id.* at 29–31. And for largely the same reasons asserted above, she argues that Nicolla is individually liable for her Rehabilitation Act claims. *Id.* at 31.

Defendants have not filed any responsive briefing to plaintiff's opposition.

## A. **Plaintiff's FMLA Claims**

The FMLA entitles "employees to take reasonable leave for medical reasons ... and for the care of a child, spouse, or parent who has a serious health condition." *Haran v. Orange Bus. Servs.*, 160 F.4th 51, 56 (2d Cir. 2025) (quoting 29 U.S.C. § 2601(b)(2)). The FMLA "provides broad protections to employees who need to take time away from work to deal with serious health conditions of the employee or her family." *Id.* (quoting *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 165–66 (2d Cir. 2017)).

Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period [...] [b]ecause of a serious health condition that makes the employee unable to perform the functions of such employee." 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" includes any "illness, injury, impairment, or physical or mental condition that involves" either "inpatient care in a hospital, hospice, or residential medical

care facility" or "continuing treatment by a health care provider."  29 U.S.C. § 2611(11).

When an employee takes FMLA leave, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under the FMLA.  *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524. 534 (S.D.N.Y. 2009) (quoting 29 U.S.C. § 2615(a)(1)).  Accordingly, the "FMLA expressly creates a private right of action for equitable relief and money damages against any employer for § 2615 violations."  *Id.* (citing 29 U.S.C. § 2617(a)(2); *see also Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 725 (2003).

Courts in this Circuit recognize "at least two species of FMLA claims: interference and retaliation."  *Albertin v. Nathan Littauer Hospital and Nursing Home*, 537 F. Supp. 3d 243, 266 (N.D.N.Y. 2021) (quoting *Woods*, 864 F.3d at 166)).  Interference claims "involve an employee being prevented from exercising her rights under the FMLA by her employer."  *Id.* (citing *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016)).  And retaliation claims "arise when an employee either exercises her FMLA rights or opposed conduct that the FMLA makes illegal."  *Id.* (citing *Potenza v. City of N.Y.*, 365 F.3d 165, 168 (2d Cir. 2004)).

Strait brings each of these FMLA claims against the defendants. Before turning to the merits of these claims, however, the Court will first

address defendants' contention that Nicolla cannot be held individually liable under the FMLA.

### 1.  Nicolla's Individual Liability Under the FMLA

Defendants contend that plaintiff's FMLA claims against Nicolla in his individual capacity must be dismissed as a matter of law because he: (1) never participated in the events underlying this lawsuit; (2) was not aware of any of the November 2022 emails between Strait and TNCS staff; and (3) was never informed of the November 30, 2022 phone call between plaintiff, Coffey, and Kostoroski.  Defs.' Mem., Dkt. No. 18-54 at 23–24.  Defendants argue that, even if Strait were fired on November 30, 2022, she has offered no evidence to suggest Nicolla's involvement and has even admitted she lacked any basis to conclude that Nicolla played a role.  *Id*. at 23–24.  Further, defendants contend that imposing personal liability upon Nicolla "would improperly conflate corporate ownership with statutory 'employer' status, effectively piercing the corporate veil without legal justification."  *Id*.  Finally, defendants assert that allowing plaintiff's FMLA claims to proceed as to Nicolla would run counter to the FMLA's purpose of ensuring decision-makers that "interfere with or retaliate against FMLA rights may be held accountable, not to expose uninvolved business owners to personal liability solely by virtue of their ownership."  *Id*.

In opposition, plaintiff argues she has shown that all four factors discussed *infra* "weight heavily in favor of defendant Nicolla's liability as an 'employer' under the FMLA."  Pl.'s Opp'n, Dkt. No. 19-14 at 24.  Strait asserts that: (1) Nicolla was the sole owner of TNCS for approximately thirty years including when she was was employed there; (2) Nicolla had authority over TNCS decision-making related to hiring, firing, promoting, demoting, employee compensation, and company finances; and (3) "everybody" working at TNCS reported directly to Nicolla.  *Id.*

Under the FMLA, individuals may be held liable where they are deemed an "employer[.]"  *Graziadio*, 817 F.3d at 422.  In this context, an employer is defined as "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer."  *Id.* (citing 29 U.S.C. § 2611(4)(A)(ii)(I)).  The Second Circuit, following a rationale relied upon by several other Circuits, has held that the definition of an "employer" prescribed by the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203(d) is akin to the definition under the FMLA and thus the same standard in evaluating employer status can be applied in the FMLA context.  *Id.* (collecting cases).  Therefore, "the economic-reality test used to analyze individual liability" under the FLSA is appropriately applied in FMLA cases too.  *Id.*

Under this test, "courts ask 'whether the alleged employer possessed the power to control the worker [ ] in question, with an eye to the "economic reality" presented by the facts of each case.'" *Id.* (quoting *Heerman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999)). In doing so, courts take into consideration "a non-exclusive and overlapping set of factors" in order to "encompass [ ] the totality of circumstances." *Id.* (quoting *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 75 (2d Cir. 2003)); *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999).

Examples of the factors that are considered include "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules, (3) determined the rate and method of payment, and (4) maintained employment records" *Id.* (citing *Herman* at 139) (internal citations omitted). "No one of the four factors standing alone is dispositive … [and] any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition." *Id.* at 422–23. Notably, when it comes to FMLA claims, courts evaluating "the economic reality of an employment relationship have construed this test as asking essentially whether the putative employer 'controlled in whole or in part plaintiff's rights under the FMLA.'" *Id.* at 423 (quoting *Noia v. Orthopedic Assocs. of Long Island*, 93 F.Supp.3d 13, 16 (E.D.N.Y.2015)).

Upon review, the Court finds Nicolla's deposition testimony squarely resolves this issue. *Supra.* Aside from being either the sole owner and/or majority stakeholder for the business at all relevant times, he holds near universal decision-making authority over TNCS. Nicolla Dep. at 18:4–19:5; 29:8–12. This includes staffing decisions such as the hiring and firing of physical therapists. *Id.* at 29:13–32:3. While Nicolla testified a clinic supervisor could decide to "terminate a physical therapist without [his] blessing[,]" he could not recall a single example over the prior five years. *Id.* at 32:15–18; 33:7–12. Nicolla also had sole authority to promote or demote physical therapists and made the decisions regarding compensation. *Id.* at 33:20–34:16. When asked who reported to him at TNCS, Nicolla answered "[e]verybody." *Id.* at 34:23–35:7.

Nicolla also testified that while TNCS staff set patient schedules and physical therapy shifts, he maintained some degree of oversight. *Id.* at 40:4–13. And in some cases, Nicolla even "objected to or disagreed with a proposed shift of schedule for a physical therapist[,]" saying that "[w]hen people do not give notice and decide to change their schedule or want to go on vacations when they are not approved, I get involved with that." *Id.* at 40:14–41:6.

Given this, the Court finds that Nicolla's authority at TNCS in no way resembles that of an "uninvolved business owner" who should not be subjected to FMLA liability. Nicolla's possessed sufficient authority to

control Strait's employment to such an extent that he must be properly classified as an employer subject to individual liability under the FMLA. Thus, defendants' request to dismiss plaintiff's FMLA claims against Nicolla will be denied. The Court now proceeds to determine whether plaintiff's FMLA claims against the defendants survive summary judgment.

### 2. Plaintiff's FMLA Interference Claim

Turning to plaintiff's FMLA interference claim, she contends that while she was entitled to twelve workweeks of FMLA leave over a twelve-month period, she was prohibited by the defendants from taking more than four workweeks of leave when she was terminated on November 30, 2022, the last day of her approved FMLA leave period. *See* Compl. at 9–10. Strait argues defendants: (1) acted in bad faith by disallowing additional FMLA leave; and (2) "willfully and unlawfully interfered with, restrained, and denied [her] right to exercise and attempt to exercise her rights under the FMLA" when they allegedly terminated her on November 30, 2022 after she told them her body was not allowing for a return to work and that she needed two surgeries. *Id.* at 10.

"To succeed on a claim of FMLA interference, a plaintiff must demonstrate that the defendant denied or otherwise interfered with a benefit to which she was entitled under the FMLA." *Graziadio*, 817 F.3d at 424 (citing 29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employer to

interfere with, restrain, or deny the exercise of or the attempt to exercise []
any right provided under this subchapter."); *see also Potenza*, 365 F.3d at 168
(describing interference claims under FMLA as "question[ing] … whether the
employer in some manner impeded the employee's exercise of [her] right").

In the Second Circuit, to prevail on an FMLA interference claim, a
plaintiff must establish that: (1) she was an eligible employee under the
FMLA; (2) the defendant is an employer as defined under the FMLA; (3) she
was entitled to take FMLA leave; (4) she provided notice to the defendant
that she intended to take leave; and (5) she was denied benefits which she
was entitled to under the FMLA.  *See Graziado*, 817 F.3d at 424.  "An
employer's intent is not at issue in an FMLA interference claim, because 'the
question is simply whether the employer impeded the employee's exercise of
his or her right [under the FMLA].'"  *Martinez v. Staten Island Hosp.*, 814 F.
Supp. 3d 380, 415 (E.D.N.Y. 2026) (quoting *Potenza*, 365 F.3d at 168)).

Two areas of the federal regulations offer additional guidance relevant
to Strait's interference claim.  *Albertin*, 537 F.3d at 267.  First, 29 C.F.R. §
825.303(b) requires employees making a second FMLA leave request to
"specifically reference either the qualifying reason for leave or the need for
FMLA leave."  *Id.*  Second, 29 U.S.C. § 825.303(c) requires an employee
seeking leave that was unforeseeable to her to adhere to "the employer's
usual and customary notice and procedural requirements for requesting

leave, absent unusual circumstances." *Id.* An employer may deny FMLA leave if the employee fails to demonstrate unusual circumstances justifying her failure to comply with defendant's leave request policy. *Id.*

However, under § 825.303(b) an employee need only "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request" and the employee "need not expressly assert rights under the FMLA or *even mention* the FMLA[.]" *Id.* (quoting 29 C.F.R. § 825.303(b)) (emphasis added). Once the employee provides this to the employer, the FMLA then places the burden onto the employer to "make further inquiry ... before denying" a request for FMLA leave. *Id.* (quoting *Coutard v. Mun. Credit Union*, 848 F.3d 102, 107-08 (2d Cir. 2017).

Defendants do not dispute the first or second elements here, conceding both that Strait was an eligible employee and that TNCS is an employer under the FMLA. And while defendants do dispute that Nicolla was an employer as defined by the FMLA, that issue has already been addressed *supra*. Thus, with respect to plaintiff's FMLA interference claim, defendants assert that: "(1) Strait was not entitled to additional leave under the FMLA[;] (2) she did not give proper notice of her intention to take leave[;] and (3) she was not denied any benefit to which she was entitled under the FMLA." Defs.' Mem., Dkt. No. 18-54 at 15.

Turning to the first disputed element, *i.e.,* whether plaintiff was entitled to take additional FMLA leave, plaintiff contends she was entitled to take additional FMLA leave in December 2022 and March 2023 by requesting such leave on both November 21, 2022 and November 30, 2022. Pl.'s Opp'n at 21. At all relevant times, Strait asserts she continued to suffer from the "serious health condition" that necessitated her November 2022 FMLA leave. *Id.* And she argues she was still entitled to eight more weeks of FMLA leave at the end of November of 2022. *Id.*

Defendants dispute Strait's entitlement to additional FMLA leave for several reasons. First, they contend that the leave that plaintiff took in November 2022 was done at their suggestion and that they provided her with the requisite paperwork to apply for FMLA leave. Defs.' Mem. at 15. Defendants claim this leave was "gratuitous" and "done as a favor" so that plaintiff could get "her personal life in order rather than for [any] 'serious health condition.'" *Id.* Defendants point to the physician certification plaintiff obtained from Dr. Cotugno, highlighting that it "failed to specify that Strait had any serious health condition that prevented her from performing the essential job functions" of her role at TNCS and did not "identify the conditions for which she required leave." *Id.* at 15–16. Defendants also point out that Strait testified to never experiencing "any difficulty" performing her job duties prior to taking her November 2022 leave. *Id.* at 16.

In addition, defendants argue once plaintiff's November 2022 leave concluded, she never requested additional FMLA leave yet they still provided her with "additional unpaid leave" without requesting any further FMLA applications from plaintiff in order to obtain wrist and knee surgeries. *Id.* at 16. Defendants point to plaintiff's November 30, 2022 email, a day before she was scheduled to return to TNCS and see patients, where she indicated that she was unable to return to work because her "body [was] just not allowing for it and [her] doctors [were] advising against it." *Id.* Defendants contend this runs counter to her own testimony that, as of November 30, 2022, she had no "serious health conditions" preventing her from performing any essential job functions. *Id.*

As a threshold matter, it is unclear whether the specific health issues Strait in her two November 2022 emails to Coffey and/or Kostoroski were ever previously raised or otherwise discussed. Notably, it is unclear if they were discussed when plaintiff and defendants met in August 2022 and agreed to Strait taking off the month of November 2023. While defendants contend that they were the ones who initially raised taking FMLA leave, it is not apparent in the record what their basis was in settling on that path. And plaintiff's e-mail to Kostoroski confirming the need for FMLA leave stated that the leave would be "personal and medical" and there is no showing TNCS ever pushed back on that or inquired further. Pl.'s Ex. 7, Dkt. No. 19-7

at 2. What is evident, however, is that the parties did agree on plaintiff taking November off to deal with, at a minimum, personal issues and that she was indeed granted FMLA leave.

At the time of that meeting, no doctor had advised plaintiff that her medical condition precluded her from working as a physical therapist. But plaintiff testified that defendants knew of her carpal tunnel syndrome during the August meeting. Pl.'s Facts ¶ 262. By contrast, Kostoroski and Coffey testified that plaintiff's medical issues largely came as a complete surprise to them in November of 2022. Defs.' Facts ¶ 85. However, defendants requested medical backup from plaintiff to support her initial FMLA leave and ultimately approved plaintiff's leave. Defs.' Facts ¶¶ 40–41. In light of these factual issues, any determinations as to whether plaintiff's actions complied with the FMLA regulations discussed *supra* such that she was entitled to additional FMLA leave are more properly reserved for a trier of fact.

Turning next to whether plaintiff provided defendants with sufficient notice about her need for additional FMLA leave beyond November of 2022, Strait contends that she was only required to provide thirty days of notice of her intention to take FMLA leave one time and did so in advance of going out on leave on November 1, 2022. Pl.'s Opp'n, Dkt. No. 19-14 at 22. While plaintiff was out on leave, she contends she became aware of the need for two

- 44 -

surgeries in the future. *Id.* Strait argues that, at this point, she was only required to advise defendants of her need for an extension of FMLA leave as soon as was practicable, which she asserts she did on both November 21, 2022 and November 30, 2022. *Id.* at 22–23.

In addition, plaintiff argues that when defendants objected to her request for leave during the November 30, 2022 phone call, she nonetheless offered to reschedule her wrist procedure from December 14, 2022 to a time that would have been more convenient for defendants. *Id.* at 23. Finally, with respect to her knee procedure, plaintiff contends that giving defendants notice on November 30, 2022 regarding a March 2023 procedure provided well over thirty days of notice to satisfy any regulatory requirement. *Id.* at 23.

Defendants contend that both plaintiff's wrist and knee surgeries were foreseeable issues. Defs.' Mem., Dkt. No. 18-54 at 17. They contend that plaintiff did not see a medical provider regarding her knee in November 2022 and that she did not see a medical provider about her wrist until November 29, 2022, eight days after her e-mail to defendants that she needed carpal tunnel surgery. *Id.* at 17–18. Finally, defendants argue that when plaintiff visited Leahy on November 29, 2022, Leahy made clear to her that both surgical and non-surgical options were available to plaintiff for her carpal

tunnel issues and that any surgery could be performed at her convenience. *Id.* at 18.

With respect to plaintiff's knee surgery, it is clear from the record that she provided notice to defendants by no later than November 30, 2022 that she required knee surgery in March of 2023. Thus, even if this medical issue was foreseeable, there is no question that plaintiff still gave TNCS more than 30 days of notice as to that procedure. Thus, the issue of notice as it pertains to this interference claim is properly centered on plaintiff's carpal tunnel surgery scheduled for December 14, 2022. But plaintiff has asserted that defendants knew of this issue well before her November 21, 2022 email. *See* Pl.'s Facts ¶ 85 ("Defendant Nicolla specifically testified to his awareness of her carpal tunnel syndrome months before plaintiff's leave, during plaintiff's meeting with Nicolla and Coffey.") At the same time, Coffey and Kostoroski have each testified that plaintiff's November 21, 2022 email was the first time they heard about plaintiff's need for carpal tunnel surgery. *Supra.* The record makes clear that Coffey pushed back in response to this notice, relying on Strait's representation that she would return to the office on December 1, 2022. Defs.' Facts ¶ 95. And Strait did reply she would be back in the office on that date as promised.

Having reviewed the record, the Court finds multiple genuine issues of material fact remain as to whether or not plaintiff provided the defendants

with adequate notice about her need for further leave.  It is unclear as to: (1) when defendants came to know of plaintiff's carpal tunnel issues; (2) how much, if at all, plaintiff's medical issues were discussed during the August 2, 2022 meeting between Strait, Coffey, and Nicolla or at any other time prior to November 21, 2022; (3) how much, if at all, plaintiff's carpal tunnel issues or the need for a carpal tunnel procedure formed the basis for granting her initial FMLA leave in November, particularly in light of plaintiff's having been granted FMLA leave in advance of November 1, 2022; [14] (4) whether the events of the November 30, 2022 phone in which Strait contends she offered to reschedule the carpal tunnel surgery suggest her notice could have been satisfactory were she to simply reschedule the procedure to a later date (which she did); and (5) whether the November 21, 2022 email plaintiff sent to TNCS qualifies as an FMLA extension request or an altogether separate request for FMLA leave.  It is equally uncertain whether plaintiff, on November 21, 2022, intended to stay out on FMLA leave starting on December 1st or to take more FMLA leave later.  The record as to this is mixed, and the parties have not addressed when plaintiff intended to take FMLA leave beyond November 30, 2022.  Plaintiff claims both that her

---

[14] The record is clear that defendants expected plaintiff to provide a certification from a doctor, which would suggest a medical basis for her FMLA leave was contemplated by both parties prior to November of 2022.  And this is also relevant because it would shed light on how foreseeable plaintiff's need for carpal tunnel surgery would have been to the defendants during that period of time.

FMLA rights were interfered with on November 30, 2022 and that she intended to return to work on December 1, 2022, and this factual discrepancy must be resolved.

Thus, there are genuine issues of material fact as to whether plaintiff provided adequate notice to TNCS about taking more FMLA leave regarding a carpal tunnel procedure and these factual issues are, again, more properly reserved for determination by a trier of fact.

Finally, the parties dispute whether plaintiff was denied benefits under the FMLA. Defendants contend that Strait fails to specify any manner in which they interfered with her exercise of a right under the FMLA or any specific benefits she claims were denied. Instead, they contend she has only alleged she was fired, and thus only a claim for retaliation is proper. Plaintiff contends that when she e-mailed Coffey on November 21, 2022 about her need for carpal tunnel surgery, she was coerced into staying and not exercising her rights for additional leave under the FMLA. Pl.'s Opp'n at 23.

As an initial matter, the Court rejects defendants' assertion that plaintiff has failed to specify what benefits she claims were denied. Regardless of whether or not plaintiff was indeed entitled to more FMLA leave, her position is clear: she was not given the full twelve workweeks of FMLA leave she believes she was entitled to after telling defendants she

required two surgeries. Nevertheless, upon review, the record is clear that what transpired on November 30, 2022 is very much in dispute.

The phone call between Strait, Kostoroski, and Coffey on that date was not recorded. Defs. Facts ¶ 116–118. The deposition testimony from Kostoroski and Coffey is entirely in conflict with the handwritten notes Strait both testified to and entered into the record in opposition to this motion. *Compare* Kostoroski Dep. and Coffey Dep. with Pl.'s Ex. 5. And there is a litany of other evidence in the record that cuts both ways. On one hand, after November 30, 2022, there is no dispute that plaintiff did continue to work in 2023, that she remained in their payroll system, and that she continued to have access to and used her work e-mail address, and that they never told plaintiff she was terminated or fired. *Supra.* On the other hand, there is no dispute that following this call, plaintiff applied for unemployment, that TNCS did not contest it, that TNCS paid Strait's remaining vacation time out, and that she never received any notice of termination from TNCS. *Supra.*

Notably, plaintiff was instructed by Kostoroski in January of 2023 to sign a letter acknowledging that she was reclassified as a temporary employee. Defs.' Facts ¶¶ 148–49. While plaintiff did sign and return this letter, the record is unclear as to what precipitated this letter that warranted it. And there is no explanation in the record why plaintiff's request for FMLA

leave as to a March 2023 knee surgery would be denied in November 2022. Nor is there any explanation as to why, if plaintiff offered to reschedule her wrist surgery to a later date, she was not permitted to receive FMLA leave at a later point in time. Construing the record in a light most favorable to plaintiff, the Court finds that a reasonable trier of fact could infer that defendants, in response to plaintiff's notices that she was going to need additional surgeries in the future, disallowed her return to work in December as a result of her suggestion of missing more time. Similarly, it can be inferred that the terms of plaintiff's employment materially changed after November 30, 2022 when she did not work for TNCS at any point between that date and January of 2023 and was forced to sign a letter acknowledging her reclassification as a temporary employee.

Therefore, the Court finds genuine issues of material fact remain as to each disputed element of plaintiff's FMLA interference claim. Accordingly, defendants' motion for summary judgment as to this claim will be denied.

### 3. FMLA Retaliation

Turning next to plaintiff's FMLA retaliation claim, plaintiff asserts that defendants retaliated against her by terminating her employment during a phone call on November 30, 2022 "upon learning that plaintiff would require additional FMLA leave for future surgeries[.]" Pl.s' Mem., Dkt. No. 19-14 at 14. During this call, plaintiff contends that Coffey and Kostoroski

were "openly angry and upset" about her need for additional FMLA leave and "believed she simply suffered from 'mental issues,' rather than a physical condition that required surgery" and that "plaintiff just 'wasn't mentally ready to come back' to work[.]" *Id.*

FMLA retaliation claims are analyzed "under the burden-shifting test set forth in *McDonnell Douglas*." *Haran*, 160 F.4th at 58 (quoting *Graziadio*, 817 F.3rd at 429). Under this test, "an employee must establish a prima facie case by establishing that 1) she 'exercised rights protected under the FMLA'; 2) she 'was qualified for [her] position'; 3) she 'suffered an adverse employment action'; and 4) 'the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.' " *Id.* at 58–59 (cleaned up). "If the plaintiff makes out a prima facie case, the defendant must demonstrate a legitimate, nondiscriminatory reason for its actions; if the defendant does so, the plaintiff must then show that defendant's proffered explanation is pretextual." *Id.* at 59.

A plaintiff can prove that the circumstances of her adverse action give rise to an inference of discrimination where "a causal connection exists between the plaintiff's protected activity and the adverse action taken by the employer." *Albertin*, 537 F.3d at 269 (quoting *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 152 (2d Cir. 2012) (cleaned up).

Alternatively, a plaintiff can establish a causal connection "directly, through evidence of retaliatory actions directed against the plaintiff by the defendant." *Id*. (quoting *Littlejohn v. N.Y.C.*, 795 F.3d 297, 307, 319 (2d Cir. 2015). Examples of direct evidence include "discriminatory statements or actions by employees who ... have enormous influence in the decision-making process." *Id*. (quoting *Smith v. North Shore-Long Island Jewish Health Sys.*, 286 F. Supp. 3d 501, 514 (E.D.N.Y. 2018) (cleaned). But "[a]lleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." *Id*. (quoting *Tepperwien v. Entergy Nuclear Operations*, 663 F.3d 556, 568 (2d Cir. 2011)).

A plaintiff can show pretext through the "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Id* (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)). However, these are "simply one form of circumstantial evidence that is probative of intentional discrimination[.]" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)). A plaintiff's *prima facie* case alone may yield evidence of intentional discrimination too. *See id*. ("The factfinder's disbelief of the reasons put forward by the defendant ... may, together with the elements of the prima facie case, suffice to show intentional discrimination." (cleaned

- 52 -

up)).  And before turning to the first step of the *McDonnell Douglas* burden-shifting test, the Court notes defendants dispute each element of the *prima facie* case plaintiff must now make out.

With respect to the first element, plaintiff argues she both exercised and attempted to exercise her rights to the FMLA.  Plaintiff contends, and the record does not dispute, that she was granted FMLA leave for the period from November 1, 2022 through November 30, 2022.  Pl.'s Opp'n at 11–12.  On November 21, 2022, plaintiff notified Coffey that she would need a carpal tunnel procedure that might make a December 1, 2022 return difficult.  *Id.* at 12; Dkt. No. 18-29.  The record shows that Coffey pushed back on this and said Strait needed to return by December 5, 2022.  *Id.*  Plaintiff responded that she would return on December 1st as promised and contends she did so with the intention of both having the procedure done and using FMLA leave at a later date.  *Id.*  And the record is unclear as to when defendants came to know of these procedures or why they initially granted plaintiff FMLA leave but there is some showing that plaintiff met with Leahy about carpal tunnel syndrome on November 29, 2022 and that she had been advised about knee replacement surgery by Dr. Buechel in October 2022.  *See* Dkt. Nos. 18-29, 18-30.

Defendants dispute this, arguing that "neither [a knee or carpal tunnel] surgery was ever scheduled and that no specific leave was requested by

plaintiff as of November 30, 2022 and that, as a result, her claim fails on this first element as a matter of law. Defs.' Mem at 20. However, as plaintiff correctly points out, defendants have not cited any authority to support this conclusion. Pl.'s Opp'n at 21.

Although the parties dispute whether plaintiff's two emails can properly viewed as requests for additional leave, construing the facts in a light most favorable to the plaintiff, it is apparent that from reviewing both e-mails to the defendants that plaintiff, already on out FMLA leave, was conveying that her health would necessitate further time off. Even accounting for factual disputes as to the parties' understanding of why plaintiff was granted FMLA leave in the first place, the Court finds that plaintiff exercised her FMLA rights in November and further attempted to exercise them by conveying her concerns about returning to work due to her physical condition on at least two occasions. There is no doubt from the record that Strait expressed concerns about returning on November 30, 2022, the question is whether that concern pertained to December 1, 2022 or a later time *after* the respective surgeries were completed.

Turning to the second element, plaintiff contends that she was qualified for her position as a physical therapist because she holds a doctorate degree in physical therapy, was at all relevant times licensed as a physical therapist in New York, worked for TNCS for over two years before

her alleged discharge, received positive feedback from her employee, and was brought back on a *per diem* basis in 2023 even after her alleged November 30, 2022 termination. *Supra.* Defendants argue that plaintiff's two emails about carpal tunnel and knee surgeries are "a clear indication" that she was unable to return to work upon receiving the surgeries. Defs.' Mem. at 21. By stating that her body was "not allowing" her to come back to work, defendants contend they were put under the reasonable impression that plaintiff was unable to perform the essential functions of her job. *Id.* The Second Circuit has made clear that "the qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; plaintiff must show only that [s]he 'possesses the basic skills necessary for performance of [the] job.'" *Cooper v. N.Y.S. Nurses Ass'n*, 847 F. Supp. 2d 437, 448 (E.D.N.Y. 2012) (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001)) (cleaned up). The Court finds that plaintiff has made a sufficient showing to satisfy the second element of her *prima facie* case.

As to the third element, plaintiff contends she suffered an adverse action when, after telling defendants on November 30, 2022 that her health was not going to permit her to return on a full-time basis because she needed two additional surgeries, she was terminated when Coffey and Kostoroski told her that if she could not work that she needed to resign from her full-

time position.  Plaintiff argues that even when she offered to return to work despite needing surgery, she was still told to resign.  She has provided record evidence that she was paid out her vacation balance and that defendants consented to her filing unemployment.  *Supra.*  Defendants contend that plaintiff was never terminated, but they offer little explanation as to what actually transpired in December of 2022.  It is also unclear why, after agreeing to give "gratuitious" FMLA leave to plaintiff in August 2022, they did not consider granting more leave in light of plaintiff's November 30, 2022 email.  In light of this, the Court finds that plaintiff has clearly made out a *prima facie* case of an adverse action.

Turning to the fourth and final element, plaintiff argues that the temporal proximity between plaintiff's use of FMLA leave and her termination, along with the words and actions of defendants, support an inference of retaliation.  A plaintiff can also demonstrate causal connection "indirectly by showing that the protected activity was closely followed in time by the adverse action." *Albertin*, 537 F.3d (quoting *Colon v. Fashion Inst. of Tech.*, 983 F. Supp. 2d 277, 287 (S.D.N.Y. 2013). Courts routinely use the date a plaintiff requested FMLA leave as a potential starting date to determine temporal proximity. *See, e.g., Gray v. Onondaga-Cortland-Madison BOCES*, 2020 WL 1029022, at *7 (N.D.N.Y. Mar. 3, 2020) (utilizing the date

that the plaintiff provided their notice of medical leave to assess temporal proximity).

Plaintiff alleges she was terminated about a month after first taking FMLA leave and the same day she notified defendants that she would need two surgeries and would be unable to work.  Defendants contend that plaintiff was never fired and that they were excited to have her back from leave.  But the record evidence shows that Coffey pushed back on plaintiff's November 21, 2022 email about needing carpal tunnel procedure, and plaintiff has testified that Kostoroski said, *inter alia*, if Strait was unable to work, she would have to be let go on November 30, 2022.  *Supra*.  There is nothing in the record from which to definitively conclude that plaintiff's inability to work was unrelated to her carpal tunnel and knee issues. And while defendants contend that they approved every accommodation plaintiff sought, a review of the record strongly suggests that this is an open question that cannot be resolved on summary judgment.  Accordingly, the Court finds that plaintiff has made out a *prima facie* case for FMLA retaliation.

Turning to the second stage of the burden-shifting analysis, defendants have not offered up a legitimate, non-discriminatory reason for plaintiff's termination.  Instead, they stand on their assertion that plaintiff was never fired in 2022.  Again, whether this is the case or not cannot be resolved on summary judgment based on the record evidence, and in light of the fact that

plaintiff has already made a *prima facie* showing of discriminatory intent in her termination that would satisfy the third prong of the burden-shifting analysis here, summary judgment cannot be granted as to Strait's FMLA claim, and defendants' request for dismissal will be denied.

### B.  NYSHRL Claims

Defendants have moved for summary judgment as to plaintiff's claims under the NYSHRL that she was unlawfully discharged based on her disability when she was both discriminated against as to the terms and conditions of her employment and deprived of her rights.   However, because the governing legal rules put forth by the parties do not fully reflect the current state of the legal governing NYSHRL disability discrimination claims, some table-setting as to the applicable law is in order.  But before doing so, as with plaintiff's FMLA claims, the Court must first determine whether Nicolla can be properly held individually liable under the NYSHRL.

### 1.  Nicolla's Liability Under the NYSHRL

Turning first to the issue of individual liability, Nicolla broadly contends he cannot be held liable under the NYSHRL because the record evidence "conclusively establishes that [he] played no role whatsoever in any of the relevant events, and therefore any claim of individual liability" necessarily must be dismissed as a matter of law.  Defs.' Mem., Dkt. No. 18-

54 at 27.  In opposition, plaintiff contends that Nicolla is liable because of his ownership interest in defendant TNCS.

Under the NYSHRL, a qualifying "employer" can be held to be liable for the discriminatory actions of others.  *Nezaj v. PS450 Bar and Restaurant*, 719 F.Supp.3d 318, 329 (S.D.N.Y. 2024) (citing *Doe v. Bloomberg, L.P.*, 167 N.E.3d 454, 460 (N.Y. 2021)).  In *Doe v. Bloomberg, L.P.,* the New York Court of Appeals "clarified […] that where a corporate entity is the plaintiff's employer, an individual affiliated with the entity cannot himself qualify as the employer […] even where the individual holds a high post at the employer or owns the entity."  *Id.* (quoting *Doe*, 167 N.E.3d at 459–460) (collecting cases).  Put differently, "a corporate employee—even its owner and CEO—no longer qualifies as an 'employer' under [NYSHRL.]"  *Bueno v. Eurostars Hotel Co.*, 2022 WL 95026, at *7 (S.D.N.Y. Jan. 10, 2022).

Given these recent changes in the law as to liability under the NYSHRL, plaintiff's argument that Nicolla, solely based upon his ownership of TNCS, is vicariously liable for the actions of his employees must be rejected.  But that is not the end of the inquiry.  The NYSHRL also provides for individual liability for aiding and abetting a liable employer.  *Nezaj*, 719 F. Supp. 3d at 318 (citing *Baptiste v. City Univ. of N.Y.*, 680 F. Supp. 3d 415, 427 (S.D.N.Y. 2023) ("[Individual defendants] can be held liable under the state statute only on an aider-and-abettor theory."); *Bueno*, 2022 WL 95026,

at *7 ("[U]nder the NYSHRL, individual employees may be liable.  Strait can pursue liability as to Nicolla for discrimination under the NYSHRL as to Nicolla under that theory.

The NYSHRL "prohibits 'aid[ing], abet[ting], incit[ing], compel[ing] or coerc[ing] the doing' of any unlawful acts[.]" *Nezaj*, 719 F. Supp. 3d at 333 (quoting *McHenry v. Fox News Network*, 410 F. Supp. 3d 51, 68 (S.D.N.Y. 2020)); *see also* N.Y. EXEC. LAW § 296(6).  To succeed on such a claim, a plaintiff must show that defendant was an actual participant in the unlawful conduct of a principal actor.  *Id.* (quoting *Feingold v. N.Y.*, 366 F.3d 138, 158 (2d Cir. 2004)).  The aider and abettor must also share the principal's intent or purpose.  *Id.* (quoting *Fried v. LVI Servs., Inc.*, 2011 WL 2119748, at *8 (S.D.N.Y. May 23, 2011)).

However, while plaintiff did point in her opposition that the aider-and-abettor theory was a route to showing individual liability under the NYSHRL, she has not advanced any arguments under this theory.  Her sole argument centers on Nicolla's ownership interest in TNCS and that he "admitted (and undisputed) facts unequivocally support the conclusion that Nicolla is an employer under the NYSHRL, and thus, subject to individual liability under the NYSHRL."  Pl.'s Opp'n at 29.

Given that Nicolla cannot be liable as an employer under the NYSHRL and because plaintiff makes no arguments regarding Nicolla's participation,

intent, or purpose as it pertains to the alleged adverse actions she suffered, the Court cannot find that Nicolla should be held individually liable under the NYSHRL.  Insofar as defendants seek to have plaintiff's NYSHRL claim dismissed as to Nicolla, that request will be granted.

### 2. NYSHRL Disability Discrimination

Before addressing plaintiff's NYSHRL law disability discrimination claim against TNCS, as indicated *supra*, some discussion is in order about the applicable legal standard for this claim.

NYSHRL disability discrimination claims can be brought under either a theory of adverse employment action or one of failing to provide reasonable accommodation.  *Kirkland-Hudson v. Mt. Vernon City. Sch. Dist.*, 665 F. Supp. 3d 412, 457 (S.D.N.Y. 2023).  "An adverse employment action is 'a materially adverse change in the terms and conditions of employment.'" *Mathirampuzha v. Potter*, F.3d 70, 79 (2d Cir. 2009) (quoting *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004).

But notably, and although not mentioned by either party, the NYSHRL was amended on August 12, 2019.  *See e.g. Goldzewig v. Consol. Edison Co. of N.Y., Inc.*, 2026 WL 21005, at *1 n.1 (2d Cir. Jan. 5, 2026); *Felix v. Bloomberg, L.P.,* 2026 WL 819071, at *5 (S.D.N.Y. Mar. 24, 2026) (citing *De Souza v. Planned Parenthood Fed'n of Am., Inc.*, 2023 WL 2691458, at *11 (S.D.N.Y. Mar. 29, 2023)).  As a result of this amendment, courts were

directed "to construe the NYSHRL, like the NYCHRL, 'liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws including those laws with provisions worded comparably to the provisions of [the NYSHRL] have been so construed.'" *Nezaj v. PS450 Bar & Rest.*, 719 F. Supp. 3d 318, 335 (S.D.N.Y. 2024) (quoting N.Y. EXEC. LAW § 300)).  As a result, the NYSHRL standards were liberalized to bring them closer to the standards under the more lenient NYCHRL.  *Id.*

For causes of action prior to the 2019 amendment, "'[t]raditionally, discrimination claims under the [Americans with Disabilities Act of 1990 (the "ADA")] and the NYSHRL were analyzed similarly, using the burden-shifting scheme set forth in [*McDonnell Douglas*]"  *Martinez v. Staten Island Univ. Hosp.*, 814 F. Supp. 3d 380, 401 (E.D.N.Y. 2026) (quoting *Wright v. N.Y.C.*, 2024 WL 3952722, at *7 (S.D.N.Y. Aug. 27, 2024)).  And before the 2019 amendment, the primary distinction between the ADA and the NYSHRL was that "the NYSHRL ha[d] a broader definition of disability than does the ADA because it does not require any showing that the disability substantially limits a major life activity."  *Id.* (quoting *Scarville v. Living Res. Corp.*, 2022 WL 4365863, at 7 (N.D.N.Y. Sep. 21, 2022)) (internal citations omitted).

However, "[a]s a result of this amendment, the NYSHRL now aligns with the standards of the [New York City Human Rights Law ("NYCHRL")."

*Id.* at 401 (quoting *Wright v. White Plains Hosp. Med. Ctr.*, 232 N.Y.S. 3d 594, 596 (N.Y. App. Div. 2d Dep't 2025); *see also Edelman v. NYU Langone Health Sys.*, 141 F.4th at 45 n.9 (2d Cir. 2025) (citing *Syeed v. Bloomberg L.P.*, 41 N.E.3d 351, 354 (N.Y. 2024)) (observing that New York's Court of Appeals "constru[es] NYSHRL and NYCHRL claims together" following the 2019 amendment).

And under the NYCHRL, plaintiffs need only show "differential treatment of any degree based on a discriminatory motive [....]" *Felix*, 2026 WL 819071 at \*5 (quoting *Gorokhovsky v. N.Y.C. Hous. Auth.*, 552 F. App'x 100, 102 (2d Cir. 2014); *see also Baker v. Bridge*, 805 F. Supp. 3d 521, 548 (S.D.N.Y. 2025) (quoting *Emamian v. Rockefeller Univ.*, 971 F.3d 380, 390 (2d Cir. 2020)) ("Under [the NYCHRL] standard, '[p]laintiff may prove an adverse employment action simply by showing that she was treated "less well."'") Moreover, NYCHRL claims "must be construed 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.'" *Id.* (quoting *Gonzalez v. N.Y.C.*, 377 F. Supp. 3d 273, 299 (S.D.N.Y. 2019)) (cleaned up).

With this standard in mind, the Court turns to plaintiff's NYSHRL claim against TNCS. TNCS contends that, as of November 30, 2022, plaintiff had no disability preventing her from performing any essential job functions of a physical therapist and thus, she could not have been discriminated

against on that basis. Defs.' Mem., Dkt. No. 18-54 at 28–29. And with regards to the November 30, 2022 phone call, TNCS reiterates that the words "fired" and "terminated" were not used and that Strait was not terminated until November 1, 2023. *Id*. at 29. TNCS argues neither Kostoroski nor Coffey had the authority to fire employees and that Strait was never furnished with a termination letter.

TNCS also contends that, from December 1, 2022 on, plaintiff remained an active employee in their payroll and accounting systems, continued to use her TNCS email account, and continued to be insured under their malpractice insurance policy. *Id*. TNCS also points to plaintiff's December 4, 2022 email to Coffey and Kostoroski thanking them for their understanding and support and expressing her understanding that TNCS had to fill her full-time role while she was absent, contending this e-mail refutes any any notion was fired. *Id*. at 29–30.

And with respect to plaintiff's claims of discriminatory motive, they again point to that November 30, 2022 e-mail as inconsistent with any inference of discrimination. *Id*. at 30. They also point to her medical records, contending they depict her sentiment that TNCS was offering "total support to help her get assistance." *Id*.

In opposition, plaintiff contends there are triable issues of material fact as to her NYSHRL claim. Pl.'s Opp'n, Dkt. No. 19-14 at 25. First, plaintiff

argues that it is "irrefutable" that plaintiff was disabled under the NYSHRL when she was terminated. *Id.* at 27. Under the NYSHRL:

> The term "disability" means (a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment, provided, however, that in all provisions of this article dealing with employment, the term shall be limited to disabilities which, upon the provision of reasonable accommodations, do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held.

NY. Exec. Law § 292(21). Strait further asserts that: (1) she "suffered serious and debilitating injuries during her prior profession as a competitive skier"; (2) her injuries "resulted in chronic pain and the ongoing need for medical treatment; (3) her "pain worsened in 2021" which necessitated "medical treatment of her knee, neck, right hand, and right wrist." Pl.'s Opp'n at 27.

Next, plaintiff contends that she suffered adverse employment actions when she was fired on November 30, 2022 and when TNCS denied her request(s) for additional FMLA leave. *Id.* at 27–28. Lastly, Starit argues that her termination took place under circumstances giving rise to an inference of discrimination. In support, she asserts that when she requested more FMLA leave due to her physical impairments, "defendants were openly and demonstrably hostile concerning her need to take additional leave to

address her disabling condition." In support, she cites the November 30, 2022 phone call, during which Strait testified being told by Kostoroski that "if you can't work and aren't going to be able to do your job we have to let you go." In plaintiff's view, this statement, along with others made during the alleged termination call, gives rise to an inference of disability.

As set forth above, plaintiff must only establish that she experienced differential treatment of any degree with a discriminatory motive. *Supra.* In light of the plaintiff's medical history as set forth in the record, there is, at a minimum, a genuine issue of material fact as to whether plaintiff was disabled under the NYSHRL on November 30, 2021. The medical records tend to suggest that plaintiff was dealing with carpal tunnel and knee-related issues at that time. *Supra.* The record also tends to show that plaintiff was receiving ongoing treatment in October and November of 2022, and that she received medical advice to undergo procedures as to both her knee and wrist. *Supra.*

And as was the case with plaintiff's FMLA claims, when plaintiff sent an e-mail to defendants on November 30, 2021, her testimony about the phone call that ensued, when contrasted with the deposition testimony of Kostoroski and Coffey, creates genuine issues of material fact about whether she was fired on November 30, 2021 and whether she was discriminated against due to her prospective inability to work due to the surgeries she

notified defendants about in November 2022. As a result, summary judgment cannot be granted as to plaintiff's NYSHRL claims and TNCS' request for their dismissal will be denied.

## C. **Rehabilitation Act Claims**

Turning next to plaintiff's claim for employment discrimination in violation of Section 504 of the Rehabilitation Act, the parties do not dispute that, aside from plaintiff's alleged disability, she was otherwise qualified to perform her functions as a physical therapist while employed by defendants or that TNCS received federal funding during all times relevant to this motion. *See* Defs.' Mem., Dkt. No. 18-54 at 31, n.3 ("Defendants do not dispute, for purposes of this motion only, that Strait was qualified for her position and that [TNCS] receives federal funds as a recipient of Medicare and Medicaid reimbursement.") What is disputed, however, is whether plaintiff's medical conditions at the time of her employment constitute a disability under the Rehabilitation Act and whether she was excluded from the job solely due to her disability.

Plaintiff contends "it is irrefutable" that her ongoing serious medical conditions constitute a disability under the statute, that defendants were aware of "these and other conditions during plaintiff's employment[,]" and that they "have not asserted otherwise." Pl.'s Opp'n, Dkt. No. 19-13 at 30. Strait argues, as she did in her FMLA and NYSHRL claims, that these

"physical impairments and her resulting need for medical leave were the sole reasons she was discharged from employment with TNCS[.]" *Id.* (emphasis in original). She also contends that "[i]n the weeks leading up to [her] termination, defendants were openly and demonstrably hostile concerning her need to take additional leave to address her disabling condition." *Id.* at 30–31. In support, plaintiff contends that during the November 30, 2022 phone call in which she alleges she was fired from TNCS, Kostoroski "stated words to the effect of 'if you can't work and aren't going to be able to do your job we have to let you go[.]" *Id.* at 31; *see also* Pl.'s Ex. 5, Dkt. No. 19-5 at 2.

Defendants have moved for summary judgment as to plaintiff's Rehabilitation Act claim, arguing Strait testified that, as of November 30, 2022, she did not have any disability nor was she denied any position based on any disability. Defs.' Mem., Dkt. No. 18-54 at 31. Rather, she was offered numerous accommodations by the defendant and was not terminated until almost a year later, on November 1, 2023, "after she had abandoned her position." *Id.* Relying on their arguments made against plaintiff's NYSHRL claims, defendants contend that plaintiff's claim fails as a matter of law because she cannot establish that as of the date she was fired, she was either a member of a protected class. *Id.* at 28, 31. In support, defendants again point to Strait's testimony that, as of December 1, 2022, she was both willing and able to perform the essential duties of her role as a physical therapist.

And if she was not disabled, defendants argue they could not have discriminated against her on the basis of her disability.  *Id.* at 28–29.  Defendants also dispute that plaintiff suffered an adverse action for the same reasons discussed *supra*.

In opposition, Strait argues that TNCS discriminated against her on the basis of disability in violation of the Rehabilitation Act.  The Rehabilitation Act "aims to 'empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society[.]'" *Sears-Barnett v. Syracuse Cmty. Health Ctr.*, 531 F. Supp. 3d 522, 540 (N.D.N.Y. 2021) (quoting 29 U.S.C. § 701(b)(1)).  It also "makes it unlawful for 'any program or activity receiving Federal financial assistance' to discriminate against an individual 'solely by reason of his or her disability.'" *Costin v. Glens Falls Hosp.*, 103 F.4th 946, 953 (2d Cir. 2024) (quoting 29 U.S.C. § 794(a)).

## 1. Nicolla's Liability Under the Rehabilitation Act

As with plaintiff's FMLA and NYSHRL claims, the Court will first address whether Nicolla can be held individually liable under this statute before addressing the merits.  Defendants broadly request dismissal of this claim as to Nicolla because "the evidence conclusively establishes that [he] played no role whatsoever in any of the relevant events[.]"  Defs.' Mem., Dkt. No. 18-54 at 27.  In opposition, plaintiff contends that Nicolla is liable under

the Rehabilitation Act based on both his ownership interest and his broad authority over all employment-related decisions at TNCS.  Pl.'s Opp'n at 31. Upon review, this issue can be swiftly resolved as a matter of law.

The Second Circuit has held that the Rehabilitation Act does not provide for individual liability.  *Goe v. Zucker*, 43 F.4th 19, 35 (2d Cir. 2022) (citing *Perros v. Cnty. of Nassau*, 238 F. Supp. 3d 395, 402 n.3 (E.D.N.Y. 2017)) *(*"[I]t is well-established that there is no individual liability under the ADA or the Rehabilitation Act, whether the individual is sued in their official or individual capacity."); *see also Sears-Barnett v. Syracuse Cmty. Health Ctr.*, 531 F. Supp. 3d 522, 535 (N.D.N.Y. 2021) ("Based on the Second Circuit's guidance thus far, district courts under its supervision have routinely held that there is no individual liability *at all* under the ADA or the Rehabilitation Act.") (collecting cases) (emphasis added).  With this standard in mind, the Court finds no reason to deviate from that precedent here. Therefore, plaintiff's Rehabilitation Act claims will be dismissed as to Nicolla.

### 2. Rehabilitation Act Claim against TNCS

Turning to plaintiff's Rehabilitation Act claim, TNCS has moved for summary judgment arguing that plaintiff cannot demonstrate that: (1) she was disabled as of November 30, 2022, the date of her alleged termination; and (2) she was denied her position by way of termination on November 30, 2022 because, in their view, she was not terminated until nearly a later on

November 1, 2023 when, in their view, Strait abandoned her position. Defs.' Mem at 31.

Plaintiff has opposed. She contends that: (1) she was physically impaired such that she is properly considered disabled as defined under the Rehabilitation Act; (2) defendants were aware of her physical impairment; and (3) by demonstrating her impairment and the need for additional leave, TNCS became "openly and demonstrably hostile" about her taking additional leave, which culminated with the alleged events on November 30, 2022 where Kostoroski told her if she couldn't work and wasn't able to do her job she would have to be let go. Pl.'s Opp'n at 31.

"Generally, a plaintiff can base a discrimination claim under the Rehabilitation Act on 'one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation." *Kelly v. N.Y.S. Office of Mental Health*, 200 F.Supp.3d 378, 390 (E.D.N.Y. 2016) (quoting *Davis v. Shah*, 821 F.3d 231, 260 (2d. Cir. 2016)); *see also Doe v. Zucker*, 520 F. Supp. 3d 217, 270 (N.D.N.Y. 2021) (quoting *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016) ("Exclusion or discrimination [under Section 504 of the Rehabilitation Act] may take the form of disparate treatment, disparate impact, or failure to make a reasonable accommodation.")).

"As with most employment discrimination claims, summary judgment motions for […] Rehabilitation Act claims are considered through" the *McDonnell Douglas* burden-shifting framework. *Sears-Barnett*, 531 F. Supp. 3d at 541 (citing *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48–49 (2d Cir. 2002), *superseded by statute on other grounds* (applying the burden-shifting framework to Rehabilitation Act discrimination claims).

Under this burden-shifting framework, Courts are tasked with "three stages of analysis." *Sears-Barnett*, 531 F. Supp. 3d at 541. First, a "plaintiff must provide a showing to support her prima face claim. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Where a plaintiff meets that initial burden, a "defendant must counter her showing by demonstrating a legitimate, nondiscriminatory reason for the adverse action the plaintiff complains of." *Id.* Where the defendant successfully makes this showing, the burden again shifts to the plaintiff to "provide evidence that the employer's legitimate reason was mere pretext." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 804).

Although plaintiff did not specify any one particular theory of discrimination in her briefing as to her Rehabilitation Act claim, based upon the identical standards articulated by both, and consistent with plaintiff's NYSHRL claims, the Court will construe plaintiff's disability discrimination

claim to be premised upon a theory of disparate treatment. *Compare* Defs.' Mem, Dkt. No. 18-54 at 31, *with* Pl.'s Opp'n, Dkt. No. 19-14 at 30. Therefore, at the first step of the burden-shifting framework, to make out a *prima facie* case of discrimination under a disparate treatment theory, a plaintiff must show that: "(1) she qualifies as a handicapped person under the [Rehabilitation] Act; (2) she is otherwise qualified to perform her job; (3) an adverse employment decision was taken against her based on her disability; and (4) the employer is a recipient of federal financial assistance." *Mattison v. Porter*, 515 F. Supp. 2d 356, 376 (W.D.N.Y. 2007) (citing *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 722 (2d Cir. 1994) (collecting cases)); *Teahan v. Metro-North Commute R. Co.*, 951 F.2d 511, 522 (2d Cir. 1991).

As mentioned *supra*, TNCS does not dispute that plaintiff was otherwise qualified for her job or that they receive federal funds. Instead, TNCS argue that plaintiff did not suffer any adverse action on November 30, 2022, and that plaintiff has testified that as of that date she did not have any disability, *i.e.*, she could not have been denied any position based on an alleged disability. Plaintiff, in response, contends that "it is irrefutable that [her] ongoing serious medical conditions constitute a disability" under the Rehabilitation Act. In support, plaintiff contends that (1) Nicolla testified hearing that plaintiff experienced some symptoms of carpal tunnel syndrome; (2) Coffey and Kostoroski each testified being aware that plaintiff "suffered

injuries as a result of skiing accidents when she was young"; (3) plaintiff had twice been scheduled for "right endoscopic carpal tunnel release and excision dorsal cyst" but "cancelled because of work restrictions"; (4) plaintiff testified that she carried physical stress due to pain she experienced performing her job duties and was seeing doctors for chronic neck, knee, and wrist pain as of March 2022; (5) plaintiff testified that the purpose of her July 2022 meeting with Nicolla and Kostoroski was to discuss her "health and future with the company" because she couldn't "seem to get time off from work to see the doctors" she needed to see; and (6) she informed Coffey and Kostoroski on November 21, 2022 that she would need a carpal tunnel release.  Pl.'s Opp'n at 30.  Plaintiff takes issue with defendants' "inexplicable" contention that Strait "testified that she did not have any disability as of November 30, 2022[.]"  *Id.*

Under the Rehabilitation Act, "disability" requires a showing that: "(1) she has a physical or mental impairment; and (2) that such impairment substantially limits one or more of her major life activities."  *Wernick v. Fed. Rsrv. Bank of New York*, 91 F.3d 379, 383 (2d Cir. 1996) (quoting *Heilwell v. Mt. Sinai Hosp.*, 32 F.3d 718, 722 (2d Cir. 1994)).  The relevant regulations define major life activities as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  *Id.*; *see also* 45 C.F.R. § 84.4(c)(1).

The regulations define physical or mental impairment "as any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine[.]" 45 C.F.R. § 84.4(b)(1)(i).

Finally, the term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of [§] 504. 45 C.F.R. § 84.4(d)(1)(i). And "[s]ubstantially limits" is not meant to be a demanding standard." *Id.* Finally, "[a]n impairment does not need to prevent, or significantly or severely restrict, the individual from performing a major life activity to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section." 45 C.F.R. § 84.4(d)(v).

Upon review, the Court finds that plaintiff has made a *prima facie* showing of disability. While plaintiff testified to being able to perform all essential functions of her job, that is not dispositive of disability under the Rehabilitation Act. *See* 45 C.F.R. § 84.4(d)(v). Plaintiff's medical record makes clear that, at that time, she was dealing with pain and injuries related to her wrist and knee. *Supra.* As to both, her medical record shows that doctors had recommended surgeries to improve her circumstances. In

addition, Plaintiff testified that she was carrying a lot of pain during the workday.

Next, the Court finds that plaintiff has made a *prima facie* showing of an adverse action having been taken against her. Put briefly, when she told Kostoroski and Coffey that she would need additional leave to receive two surgeries, she testified to being told she needed to resign and that if she was not going to be able to work, then she would have to be let go. *Supra*. Moreover, despite having taken only four weeks of FMLA leave, there is no showing she was ever granted additional FMLA leave at any point thereafter.

In response, Kostoroski and Coffey testified that they never told plaintiff that she was terminated or fired during the November 30, 2022 phone call. Further, TNCS contends that Strained continued to work for them for roughly another year, that she continued to use her TNCS email, that they provided her with treatment benefits following her surgery, that she continued to work on a per diem basis in 2023.

However, after this call, plaintiff has testified that she did not return to TNCS in December 2022 despite not being granted additional FMLA leave, that she was paid out her vacation balance in December 2022, and that she applied for unemployment which TNCS did not contest. *Supra*. Plaintiff also testified that she ultimately was asked by TNCS to signed an agreement to continue working on a *per diem* basis. The Court also finds that plaintiff has

put forth evidence that creates a genuine dispute of material of fact as to whether, as a result of requesting further leave from TNCS to receive surgeries, the terms of her employment were materially altered on the basis of her inability to work.  *Supra.*

Accordingly, TNCS has failed to meet their burden under Rule 56 as to plaintiff's Rehabilitation Act claim and their motion will be denied.

## V.  **CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment will be denied with the exception of plaintiff's claims under the NYSHRL and Rehabilitation Act against Nicolla in his individual capacity.  This matter will be scheduled for trial as to the surviving claims in due course.

Therefore, it is

ORDERED that

1.  Defendants' motion for summary judgment (Dkt. No. 18) is GRANTED in part and DENIED in part;

2.  Defendants' motion to dismiss plaintiff's FMLA claims for interference and retaliation is DENIED;

3.  Defendants' motion to dismiss plaintiff's NYSHRL disability discrimination claim against Nicolla in his individual capacity is GRANTED;

4.  Defendants' motion to dismiss plaintiff's NYSHLR disability discrimination claim against TNCS is DENIED;

5. Defendants' motion to dismiss plaintiff's Rehabilitation Act employment discrimination claim against Nicolla in his individual capacity is GRANTED;

6. Defendants' motion to dismiss plaintiff's Rehabilitation Act employment discrimination claim against TNCS is DENIED; and

7. The parties shall file a joint status report in THIRTY DAYS from the date of this opinion advising the Court of trial readiness and whether a settlement conference before the magistrate judge might be fruitful.

The Clerk of the Court is directed to terminate the pending motion and set a deadline accordingly.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated:  July 27, 2026
        Utica, New York.